FILED

01/30/2019

Clerk of the
Appellate Courts

# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
May 31, 2018 Session Heard at Nashville[1]

## STATE OF TENNESSEE v. HENRY LEE JONES

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 03-06997          W. Mark Ward, Judge[2]**

_____

## No. W2015-02210-SC-DDT-DD

_____

In this capital case, a Shelby County jury convicted the Defendant, Henry Lee Jones, of alternative counts of first degree premeditated murder and first degree felony murder of Clarence James and alternative counts of first degree premeditated murder and first degree felony murder of Lillian James. The jury sentenced the Defendant to death on all four counts. As for the two counts related to Mr. James, the jury found the evidence sufficient to support six aggravating circumstances. As for the two counts related to Mrs. James, the jury found the evidence sufficient to support five aggravating circumstances. The trial court merged each of the felony murder convictions into the corresponding premeditated murder convictions and imposed two sentences of death. On direct appeal, the Court of Criminal Appeals affirmed the Defendant's convictions and sentences. On automatic review pursuant to Tennessee Code Annotated 39-13-206(a)(1), we now address the following issues: (1) Whether the Defendant was unconstitutionally denied the right to counsel; (2) whether the trial court abused its discretion in admitting into evidence the former testimony of Tevarus Young; (3) whether the evidence was sufficient to support his convictions; and (4) whether the trial court erred in denying the appointment of a mitigation expert. We also conduct our mandatory review of the Defendant's death sentences. Upon our thorough review of the record and applicable law, we affirm the Defendant's convictions and death sentences. As to the remaining issues raised by the Defendant, we agree with the Court of Criminal Appeals' conclusions and attach as an appendix to this opinion the relevant portions of that court's decision.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the**
**Court of Criminal Appeals Affirmed**

---

[1] Oral argument was heard on the campus of Lipscomb University in Nashville, Davidson County, Tennessee, as part of the American Legion Auxiliary Volunteer Girls State S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

[2] The Hon. J. Robert Carter, Jr., presided over the pre-trial matters of this case.

JEFFREY S. BIVINS, C.J., delivered the opinion of the court, in which CORNELIA A. CLARK, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined. SHARON G. LEE, J., filed a concurring opinion.

James E. Thomas (on appeal)[3] and James M. Gulley (on appeal/resource counsel at trial), Memphis, Tennessee, for the appellant, Henry Lee Jones.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Leslie E. Price, Senior Counsel; Amy Weirich, District Attorney General; Tom Henderson and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural History

This case arises out of the murders of Clarence and Lillian James in their Bartlett, Tennessee, home on August 22, 2003. The Shelby County Grand Jury indicted the Defendant, Henry Lee Jones, on October 7, 2003, for the first degree premeditated murder of Clarence James, the first degree premeditated murder of Lillian James, the first degree felony murder of Clarence James in perpetration of a robbery, and the first degree felony murder of Lillian James in perpetration of a robbery. The State filed a notice of intent to seek the death penalty on February 17, 2004.

This is the second trial for the Defendant, who was first tried in 2009. Although the first trial resulted in convictions on all counts and sentences of death, this Court reversed the convictions because of a prejudicial evidentiary error and remanded the case to the trial court for a new trial. State v. Jones, 450 S.W.3d 866, 871 (Tenn. 2014). The second trial was held on May 11–16, 2015.

### I. Pretrial Hearings

Prior to trial, the attorney who represented the Defendant in the first trial was permitted to withdraw. On October 31, 2014, the trial court appointed two private attorneys to represent the Defendant. These attorneys filed *ex parte* motions seeking funding for a "fact investigator," which was granted, and for a mitigation investigator, which was denied. In denying the motion for a mitigation investigator, the trial court expressed its opinion that, in view of the appointment of two lawyers and approval of

---

[3] Mr. Thomas was permitted to withdraw on January 23, 2018, after he accepted a position with the District Attorney General's office for the 30th Judicial District and began employment with that office on January 16, 2018.

funding for a fact investigator, "one of the lawyers appointed to represent Mr. Jones should be able to perform the mitigation investigation." Thereafter, the Defendant became dissatisfied with his new attorneys and, in December 2014, filed a series of *pro se* motions with the trial court. Included in those motions was a motion to waive his right to an attorney and asking that he be permitted to represent himself.

The trial court held a hearing on the motion. At that hearing, the trial judge engaged the Defendant in an extensive colloquy concerning his right to representation by an attorney, the pitfalls of proceeding without an attorney, and the fact that he would be bound by the Tennessee Rules of Evidence and the Tennessee Rules of Criminal Procedure. The Defendant told the court that he had represented himself in a prior capital case in Florida and wished to represent himself in this case as well. He affirmed that he understood he was facing the death penalty, asserted that he understood the elements of the offenses with which he was charged, and represented that he had read and was familiar with the rules of evidence and procedure. The trial judge repeatedly and strongly discouraged the Defendant from representing himself. In the end, however, the court found that the Defendant had knowingly and voluntarily waived his right to counsel.

On no fewer than nine occasions during the pretrial proceedings, the trial court questioned the Defendant about his decision to represent himself and offered to re-appoint counsel. The Defendant repeatedly declined the offer. On February 11, 2015, the Defendant agreed to "resource counsel" to assist him in obtaining discovery, in issuing subpoenas, and otherwise assisting in matters that the Defendant could not do from the jail. As a result, the trial court appointed private attorney James Gulley to assist the Defendant.

When trial began on May 11, 2015, the court once again advised the Defendant of his right to an attorney and offered to appoint counsel for him. The trial judge stated, "I am begging you to let an attorney represent you." The Defendant responded, "It won't happen." When the Defendant affirmed that he was waiving his right to counsel, the court had Mr. Gulley review with him the written waiver of right to counsel, and the Defendant reviewed and signed it.

The first two days of trial encompassed jury selection, reading of the indictments, the Defendant's entry of a "not guilty" plea, preliminary instructions to the jury, and opening statements. When trial resumed on May 13, 2015, the trial court yet again asked the Defendant to reconsider his decision to represent himself. Although the Defendant persisted in his decision to proceed *pro se*, the court advised him that if at any point he would like Mr. Gulley to step in and represent him, he was available.[4]

---

[4] On May 14, 2015, the trial court reiterated the Defendant's right to consult with elbow counsel

At the first trial, the State's key witness was the Defendant's co-defendant, Tevarus Young. Following the Defendant's convictions in that trial, Mr. Young pled guilty as a mitigated offender to two counts of facilitation of first degree murder in return for two concurrent thirteen-and-one-half-year sentences. By the time of this second trial, Mr. Young had fully served those sentences, been released, and returned to his home state of Florida.

On April 13, 2015, one month before trial, the State filed a petition to secure Mr. Young's appearance as a material witness for trial and for the advance payment of witness travel expenses pursuant to the Uniform Law to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings. See Tenn. Code Ann. § 40-17-201 through -212 (2012) ("the Law to Secure Witnesses"). That same day, the trial court granted the State's petition and issued a certificate to secure Mr. Young's attendance to testify at trial.

On May 4, 2015, the State filed another petition to secure Mr. Young's appearance including an averment that the Assistant District Attorney trying the case had spoken with Mr. Young and that Mr. Young had advised him that he would not agree to appear and testify. Mr. Young also had stopped answering his phone and appeared to be evading service by Dade County, Florida, investigators trying to locate him.

The State requested that Mr. Young be taken into custody and delivered to an officer of Shelby County, Tennessee, to secure his presence for the trial scheduled to begin on May 11, 2015. The trial court issued a certificate and an order to transport Mr. Young to Tennessee pursuant to the Law to Secure Witnesses on May 7, 2015. In that order, the court noted that the Circuit Court of the Eleventh Judicial Circuit for Miami-Dade County, Florida, had received the earlier certificate issued by the trial court and had issued a summons for Mr. Young. The trial court noted that, on May 6, 2015, the Florida court found that Mr. Young was actively evading service of the summons to appear in that court, that service on Mr. Young's mother did not procure his appearance in court pursuant to that summons, and that the court had ordered the immediate arrest of Mr. Young.

Nevertheless, as of May 11, 2015, Mr. Young was still eluding service. Accordingly, the State filed a motion to have Mr. Young declared an unavailable witness and sought permission to use a transcript of Mr. Young's testimony from the 2009 trial. This motion documented the State's efforts to find Mr. Young:

---

at any time and told the Defendant that if he changed his mind and wanted counsel to step in, the court would "make that happen."

4

In attempting to prepare for the pending trial, the State of Tennessee has made every effort to obtain the presence of Tevarus Young to testify at the pending trial. Law enforcement officers in Fort Lauderdale, Broward County, Florida, where witness Young was living when these events began, were contacted. Using paperwork from the misdemeanor probation, law enforcement officers in Miami-Dade County, Florida, were able to locate his mother's residence in Miami-Dade County.  Officers were told by his mother that Young was living there and ascertained his cell phone number. Assistant District Attorney General talked with Tevarus Young at that number in early April. Young advised that he would not return to Tennessee to testify.  Accordingly, paperwork pursuant to the Uniform Law to Secure the Attendance of Witnesses from Within or Without a State in Criminal Prosecution was prepared, filed, and forwarded to the Florida State's Attorney's office with jurisdiction over that address. Law enforcement officers continued to try to locate Young and served papers on his mother, ordering Tevarus Young to appear in their Court to show cause why he should not be ordered to appear in this Honorable Court. Young's mother then told the officers that Young did not live there.  Officers in two different counties have searched for Tevarus Young to no avail.

Fort Lauderdale, Florida, Broward County, law enforcement officers have visited addresses of possible relatives of the witness in their jurisdiction as well as developing an address in Oklahoma for a possible past girlfriend. That address is being checked on by Oklahoma officers. Multiple emails [] and phone calls have been exchanged between multiple prosecutor's law enforcement offices in an attempt to locate the witness.

On May 6, 2015, the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County entered an Order [] finding that Tevarus Young was "actively evading service" of the papers and issued a Writ of Bodily Attachment [] which has been entered into the National as well as Florida law enforcement networks (NCIC and FCIC). Additionally, the Tvarus [sic] Young has been flagged by the Florida Department of Law Enforcement, the equivalent of our Tennessee Bureau of Investigation.

The Miami Herald newspaper, on May 6, 2015, printed and posted an article about the search for Tevarus Young. []

As of this date, Tevarus Young has not been located.

Prior to the beginning of trial on May 11, 2015, the trial court held a brief discussion on the record concerning the unavailability of Mr. Young. The State represented that while an active search for Mr. Young was ongoing and a warrant had been issued for his arrest in Florida, Mr. Young had not been found. Mid-trial, the court held a jury-out hearing on the status of Mr. Young. The State again represented that while the search for Mr. Young continued, he had not been found. The State introduced a redacted copy of the transcript of Mr. Young's testimony from the 2009 trial, with all references to a jury trial, bench conferences, and objections omitted. It proposed advising the jury that the witness was unavailable and having the testimony read in question and answer form, with one prosecutor reading the former questions and another reading Mr. Young's answers. Over the Defendant's objection that he would not have the opportunity to cross-examine Mr. Young about his former testimony, the trial court ruled that Mr. Young was unavailable as a witness. The court overruled the objection, noting that the Defendant was present and had an opportunity to cross-examine Mr. Young when he testified at the first trial. Therefore, his testimony from that prior trial would be read to the jury in question and answer form.

Prior to the reading of Mr. Young's testimony, the jury was instructed that because Mr. Young was unavailable, his testimony would be read to them. The jury was informed that the testimony was given under oath as a witness in a prior courtroom hearing and that the Defendant was involved in that hearing and had an opportunity to cross-examine Mr. Young at that time while being represented by an attorney. The jury was told to "regard this prior sworn testimony the same as you would as if any other witness had testified to it here in open court and this witness's credibility will be determined by the same rules by which you determine the credibility of other witnesses." The Defendant's request at that time to also tell the jury why Mr. Young was not present—because he was evading process—was denied. The following proof was adduced during the guilt/innocence phase.

## II. Trial

The murders in this case were committed on August 22, 2004. Tevarus Young testified in detail about meeting the Defendant in Ft. Lauderdale, Florida, sometime in August 2003. In the days leading up to the Tennessee murders, they met in a Ft. Lauderdale park where Mr. Young—then homeless—was sleeping. The Defendant approached Mr. Young and offered to pay Mr. Young twenty dollars to perform oral sex on him. Mr. Young agreed. The Defendant first drove Mr. Young in a Dodge Aries K-car to a local McDonalds, where the Defendant bought Mr. Young breakfast. The Defendant then made numerous stops. He drove to a woman's house where he made a phone call, to a pawn shop where he pawned a necklace, to a second pawn shop where he pawned a ring, then to a courthouse in Miami where he paid some tickets.

6

From the courthouse, after a short delay caused by running out of gas, the Defendant drove to a warehouse where he parked the car. While parked at the warehouse, Mr. Young performed oral sex upon the Defendant inside the car, and the Defendant paid Mr. Young twenty dollars, as agreed. The Defendant then invited Mr. Young to travel with him to Daytona to visit some women. Mr. Young agreed, and they ended up spending the night with the women, "Toosie" and "Tawana," in Daytona, Florida. The next morning, following an argument between the Defendant and Toosie, the two men embarked on a road trip. The Defendant told Mr. Young they were going to visit some of his relatives, but Mr. Young did not know the destination and never asked. He testified that the Defendant drove the entire trip and claimed that he slept for much of the trip.

On the morning of the murders, Mr. Young woke up in a gas station/Burger King parking lot when a man in a Burger King uniform knocked on the window of the car and asked for "Henry." The Defendant was not in the car, so the man went inside the store. Mr. Young went inside where he saw the Defendant talking to the man, who turned out to be the Defendant's nephew by marriage. Mr. Young used the restroom and then sat at the table with the two men. An employee brought them some food.

After eating, they left the restaurant, and the Defendant drove to an apartment complex where he parked the car. Mr. Young followed the Defendant across the street and past several houses to a house where an elderly man was sitting in his garage with the garage door open. The Defendant greeted the man with, "Hey Pops, how are you doing?" After a brief discussion about mowing the man's grass, the man, although declining Mr. Young's offer to mow, asked Mr. Young to put the mower in the back yard for him. Mr. Young left the Defendant and the man talking and took the mower through a fence gate to a shed in the back yard and left it beside the shed. He then stopped to get a drink from a garden hose. When he returned to the front of the house a few minutes later, the garage door was closed and neither the man nor the Defendant was present.

Mr. Young knocked on the front door and, when no one answered, walked inside. He saw the Defendant carrying a rope and some bloody rags. Mr. Young followed the Defendant down a hallway to a room where an older woman was present. The Defendant threw the woman, who was screaming, face down on the floor and asked her, "Old lady, old lady, you know what time it is?" The woman was fully clothed at the time. The Defendant used a rope to tie the woman's arms behind her back, then asked for her purse and her money. She told him it was in another room. The Defendant instructed Mr. Young to sit in a chair next to the doorway and left to retrieve the purse. While he was gone, the woman asked Mr. Young if they were going to kill her. Until then, Mr. Young thought that the man and woman were relatives of the Defendant. The woman denied knowing the Defendant.

7

When the Defendant returned, he told Mr. Young to stand and dumped the contents of a purse into the chair. When the woman told the men that her son was supposed to be on his way the Defendant remarked, "Yeah, if he come he going to get the same thing as you're going to get." The Defendant then picked up the woman and pushed her into another room, where he put her face down on the floor, removed the rope from her arms, put it around her neck, and put his foot on the back of her neck as he strangled her with the rope. The Defendant then took a hook-bladed knife from his waistband and cut the woman's neck more than one time. When Mr. Young asked him why he killed the woman, the Defendant replied that he had to kill her because she had seen his face.

The Defendant left the room, and Mr. Young heard him slamming cabinet doors in the kitchen. He returned with a brown plastic bag and instructed Mr. Young to hold the bag while he put in it the rope from the woman's wrists and some rags. Mr. Young followed the Defendant to the laundry room where he saw the older man he met earlier lying face down on the floor in a pool of blood with his hands tied behind his back. The Defendant removed ropes from the man's hands and legs and put them inside the bag. The Defendant and Mr. Young took the bag into a bathroom, and the Defendant ran water into the bag. The Defendant took the bag from Mr. Young, went back to the bedroom, and emptied the contents of the female victim's purse into the bag. At some point, the Defendant removed rings from the dead woman's fingers, and Mr. Young later put them on his own fingers. The men then left the victims' home, taking the bag with them.

Mr. Young testified that their first stop was a gas station. The Defendant and Mr. Young went inside. When the Defendant returned to the car, he took a billfold out of the plastic bag, removed a credit card, and used the credit card to pay for gas. Next, the Defendant drove to a shopping mall. On the way, he began taking things out of the billfold and throwing them out the window. He gave Mr. Young $1,500 in cash from the billfold. When they arrived at the mall, the men went inside to a Footlocker store and bought some shoes, then to a J.C. Penney store and bought some clothes. They used cash to pay for these items.

Mr. Young testified that after leaving the mall and as they were driving, he saw the knife used to kill the woman on the console between the car seats. The Defendant commented that the knife had been with him a long time and made Mr. Young touch it. Then, the Defendant threatened that if Mr. Young ever told anyone what happened, he would kill him and cut off his genitals. Mr. Young swore to the Defendant that he would never tell.

The two men drove from the mall to a car lot. On the way, they changed into the new clothes and threw the ones they wore during the murders out of the window. At the

8

car lot, the Defendant purchased a white Lincoln Town Car.  After the car was purchased, the Defendant gave Mr. Young the keys to the Dodge Aries and told Mr. Young to follow him.  Mr. Young testified that he did not try to drive away because he did not know where they were and did not want to risk the Defendant stopping him.  He wanted to wait to get somewhere safe.

They drove to a hardware store, where the Defendant purchased some screws that he used to put a license plate from the trunk of the Dodge onto the Lincoln.  From there, they drove for several hours, stopping two or three times for gas.  When they stopped, the Defendant would pay for the gas with a credit card at the pump.  Eventually, the Defendant pulled into a rest stop.  Mr. Young crawled into the back of the Lincoln to sleep but was awakened by the Defendant "wrestling" him and forcibly sodomizing him.

When the drive resumed, the two men went back to Toosie and Tawana's place in Florida.  Mr. Young used drugs with Tawana, while the Defendant left with Toosie.  The Defendant took the keys to both cars with him.  When the Defendant returned, he and Mr. Young left again, with the Defendant in the lead and Mr. Young following.  They headed south on I-95.  Mr. Young claimed that, in an attempt to escape the Defendant, he started driving "like a maniac" until he was eventually stopped by a police officer.  Mr. Young, who had no license or registration for the car, gave the officer a false name and social security number and told the officer he was driving the car for his stepfather, whom he was following.  The Defendant exited the highway and came back, pulling in behind the police officer.  The Defendant confirmed that Mr. Young was driving the car for him but told the officer that he had just met Mr. Young.  Due to the discrepancies in Mr. Young's story, the officer pressured him for his real name.  When Mr. Young eventually gave his real name, the officer discovered a misdemeanor warrant and arrested him.  The officer told the Defendant to leave and come back for the car.

Mr. Young testified that he initially was taken to the local jail in Melbourne, Florida, but was subsequently transferred to a jail in Ft. Lauderdale.  He had Lillian James' rings in his possession when he was arrested, and they were stored with his personal property at the jail while he was incarcerated.  Eventually, law enforcement officers showed up in Ft. Lauderdale and began questioning him about the murders in Bartlett, Tennessee.  Mr. Young admitted that he first lied to the officers and denied any knowledge of the Bartlett murders.  Later, he falsely implicated the Defendant's nephew by marriage, Wesley Armstrong, as being involved in the murders.  He testified that he eventually gave a truthful account of his own and the Defendant's involvement.

Margaret Coleman, Lillian James' daughter, discovered the victims' bodies on the afternoon of August 23, 2003, when she stopped by the house to check on her mother. Mrs. James worked in housekeeping on the night shift at Methodist University Hospital.

9

While Mrs. James usually rode the bus to work, her son and daughter took turns picking her up when she got off work at 1:30 a.m. When Ms. Coleman went to the hospital to pick up her mother on the morning of Saturday, August 23, 2003, she was told that Mrs. James had not shown up for work. Ms. Coleman tried to call her mother, but there was no answer at the house. Ms. Coleman attributed this to the storms that had moved through the area that night. Ms. Coleman called again later that morning and several times throughout the day. When her calls continued to go unanswered, she went to the house to check on her mother. As Ms. Coleman entered the house, she noted that the front door was open, and it was apparent from several items that were out of place that something was awry. Sensing that something was wrong, Ms. Coleman entered the house only far enough to retrieve a telephone from the den, then immediately went outside and called 9-1-1. Ms. Coleman testified that it was Clarence James' habit to carry two wallets—one in each back pocket. It was Lillian James' habit to wear several favorite pieces of jewelry. Ms. Coleman identified several rings that were retrieved from Tevarus Young's personal effects as being her mother's rings.

Investigating officers arrived in response to the 9-1-1 call at about 3:30 p.m. on August 23, 2003. Several officers testified about the crime scene and the injuries to the victims. Although the victims' house overall was very neat, a few items were out of place. For instance, a linen closet door was open, and linens were spilling out of the closet onto the floor. In the dining room on a sideboard table, there was a lamp from which the electrical cord had been cut off. In one bedroom, the bed mattress was sideways on top of the box springs and chest drawers were opened. In the hall bathroom, officers observed splashes of "watered-down blood" around the bathroom sink as though someone had washed blood off their hands.

In the master bedroom, the body of Lillian James was lying face down on the floor in a pool of blood, clothed only in a pair of panties. Her throat had been cut, nearly severing her head from her body. When Mrs. James' body was moved, a yellow electrical cord and a piece of duct tape were found beneath it. Police discovered the body of Clarence James lying on his side in a pool of blood on the floor of the utility room.

Captain Tina Schaber of the Bartlett Police Department testified that no forensic leads in the form of fingerprints or DNA were recovered from the James' house. Both she and Detective Kevin Thompson testified that on August 24, 2003, they returned to the victims' home and collected bank and credit card statements. They started tracing use of the cards to see if they were used after August 22, 2003. Mrs. James' First Tennessee Bank credit card records showed that the card was used five times beginning on August 22nd and through August 24th. At 3:18 p.m. on the 22nd, it was used to purchase fuel at the Sycamore View Citgo Station near the victims' home. That evening at 7:56 p.m., it was used to purchase fuel in Batesville, Mississippi. Later that night, at 11:41 p.m., it

10

was used to purchase fuel in Madison, Mississippi. The following day, the credit card was used to purchase fuel in Gulfport, Mississippi. Then, on August 24th, at 8:12 a.m., the card was used to purchase fuel in Melbourne, Florida. Bartlett detectives issued a "be-on-the-lookout" (BOLO) bulletin on the National Crime Information Center database regarding use of the credit card, with information that the card was related to a homicide and that any suspect using the card should be detained.

Police investigators pulled videos from each of the locations where the card was used. The video from inside the Sycamore View Citgo station depicted a man resembling Tevarus Young making a purchase. A common thread in several of the videos was the appearance of a light-colored Dodge Aries K-car and a white Lincoln Town Car. The BOLO bulletin was updated with this information, leading to the discovery of the purchase, on August 22, 2003, of a white 1993 Lincoln Town Car from the "Auto Corral" in Batesville, Mississippi, within five miles of where Mrs. James' credit card was used that same day. The purchaser of the white Lincoln Town Car was Henry Lee Jones, the Defendant.

Michael Smith was the co-owner of the Auto Corral, a used car dealership in Batesville, Mississippi. Mr. Smith corroborated Mr. Young's testimony about the Defendant's purchase of a white Lincoln Town Car. He testified that in the late afternoon hours of August 22, 2003, the Defendant arrived at the lot driving a white Dodge Aries K-car. He was accompanied by another man. Mr. Smith's father sold a white 1993 Lincoln Town Car to the Defendant, and Mr. Smith handled the paperwork for the purchase. Mr. Smith drew up a contract for sale and made a copy of the Defendant's driver's license and social security card. The Defendant paid cash for the car. The Defendant left driving the Lincoln, followed by his companion, who drove the Dodge. Mr. Smith identified a bill of sale for the purchase, signed by "Henry Lee Jones," and a photocopy of the Defendant's driver's license and social security card that the Defendant used for identification while making the purchase.

Several witnesses corroborated the Defendant's presence in or near Bartlett, Tennessee, during the time of the murders. Diane Armstrong is the Defendant's niece. She testified that, earlier in 2003, the Defendant and his girlfriend had lived with her and her husband, Wesley Armstrong, in their home in Arlington, Tennessee. For a time, the Defendant worked for Wesley at the Burger King where Wesley was employed as a manager. Eventually, the Defendant and his girlfriend moved into their own apartment in the Bartlett area of Memphis, and Ms. Armstrong saw him less frequently after he moved. Ms. Armstrong testified that, early on a Friday morning in August 2003, after she had not seen the Defendant in a month or two, he showed up at her house looking for Wesley. Ms. Armstrong sent the Defendant to the Burger King that Mr. Armstrong managed and told him that Mr. Armstrong would buy his breakfast. When Ms.

11

Armstrong walked the Defendant back to his car, she saw another young man asleep in the front passenger seat. The Defendant left, and she never saw him again.

Ms. Armstrong's husband, Wesley Armstrong, testified that he was the general manager of the Burger King in Wolfchase Mall in Arlington, Tennessee. In May or June 2003, the Defendant and his girlfriend came to live with him and his wife, and they stayed for three to four weeks. Both of them worked for him for a short time—the Defendant six to eight weeks, the girlfriend for a lesser time. Mr. Armstrong had not seen the Defendant in a while and assumed he had left town when, one Friday morning in August 2003, while he was on his way back to the Burger King store from making a bank deposit, he received a telephone call from his wife telling him that the Defendant was on his way to the store to eat breakfast. Mr. Armstrong testified that when he arrived back at the store, the Defendant was already there. The Defendant was accompanied by a young skinny black man with braids, and Mr. Armstrong had the Defendant bring his friend inside the store where he fed both of them breakfast. The Defendant told him he was in town to get mail and stayed for approximately an hour. After they finished eating, the Defendant and his companion got into the car and left.

Justin Turberville testified that, in August 2003, he lived at the Deerfield Apartments on the corner of Bartlett Boulevard and Sycamore View. For a time, the Defendant lived in an apartment "caddy-corner" from him, and they would see each other coming and going. On a Friday before seeing the crime tape up at the victim's house, he saw the Defendant in the neighborhood. The Defendant told him he was in town checking on mail. Mr. Turberville drove by the crime scene on the way home from work that day. He later saw the Defendant's photograph on a television news report of the crime and contacted the police.

Two witnesses testified that, on a day prior to the report of the victims' deaths, they saw victim Clarence James sitting in his garage and speaking to two African-American men. Gretta Thompson, who knew the victims "in passing," passed the victims' house nearly every morning on her way to work. She testified about Clarence James' habit of sitting out in his garage or his yard and waving to passers-by. She recalled that, on a Friday morning in August 2003, as she was driving to work at about 8:00 a.m. that morning, she noticed Mr. James in his usual spot, with two black men standing beside him and talking.

Christopher Stallion, who was employed by the Bartlett City Sanitation Department, regularly drove a Friday route that passed by the victims' house. He saw Mr. James every Friday, sitting out under his "carport." On Friday, August 22, 2003, he would have passed by the victim's home at 12:40 p.m. On that day, he recalled seeing Mr. James in his usual spot. Mr. Stallion recalled that on this occasion, he saw two black

12

men with the victim, one standing to the left and one kneeling down. Once he heard on the news what had happened to the victims, Mr. Stallion contacted the Bartlett Police Department and told them what he had observed.

Officer Carlos Reyes of the Brevard County, Florida Sheriff's Office, testified that on Monday, August 25, 2003, as he was driving southbound on I-95 in an unmarked police car, he noticed a white Dodge Aries "erratically" driving south on I-95 near Melbourne, Florida. The car was speeding, weaving in and out of traffic, tailgating, and flashing its lights for cars to get out of its way. Officer Reyes testified he was reluctant to make a traffic stop because he was on his way to a meeting. When the car began to tailgate him, Officer Reyes flashed his rear blue lights in an attempt to get the car to back off. The car slowed for a short time, but eventually pulled behind him and began to tailgate again. Officer Reyes moved over to allow the car to pass and then, reluctantly, made a traffic stop. He asked the driver, later identified as Tevarus Young, why he was driving so erratically. Mr. Young told Office Reyes that he was following his stepfather, who was driving a white Lincoln Town Car. Mr. Young did not have a driver's license or vehicle registration and initially gave Officer Reyes a fictitious name and date of birth, which came back from the dispatcher as "no record found." Shortly after Officer Reyes made the traffic stop, a white Lincoln Town Car pulled in behind him. The driver identified himself as Henry Lee Jones and told the officer that he had just met Mr. Young and was paying him to drive the Dodge to south Florida. Mr. Jones provided the proper documentation for both cars.

Based on the inconsistent information provided by the two men, and after verifying that Mr. Jones was the owner of both vehicles, Officer Reyes told Mr. Jones that while he would not have the Dodge towed, Mr. Jones could not remain in the area and would have to return in about twenty-five minutes to retrieve the Dodge. The Defendant left, and Officer Reyes confronted Mr. Young with the information that Mr. Jones was not his stepfather and he had provided a false name and date of birth. Mr. Young relented and gave Officer Reyes his true name and date of birth. When Officer Reyes performed a records check and discovered that Mr. Young had an outstanding warrant from Broward County, Florida, he arrested him.

Detective Johnny Lawson, formerly of the Melbourne, Florida, Police Department, testified that, in late August 2003, he received a BOLO from the Bartlett, Tennessee, Police Department about a white Lincoln Town Car identified with the use of a credit card at a Speedway gas station at the intersection of I-95 and US192 in Melbourne. Detective Lawson contacted a Brevard County Sheriff's deputy, who provided him a photo of the car taken from security cameras at the Melbourne Speedway station.

13

On about September 4, 2003, while in Ft. Lauderdale, Florida, working another case, Detective Lawson saw a white Lincoln Town Car matching the description in the BOLO, with vanity tags "69BAM," which was registered to the Defendant. Detective Lawson contacted the Bartlett, Tennessee, Police Department with this information. When doing an "offline search," he learned that this vehicle was involved in a traffic stop in Melbourne on August 25, 2003, with a Dodge Aries K-car. He contacted Officer Reyes and learned of Tevarus Young's involvement and that Mr. Young was incarcerated in Ft. Lauderdale, Florida. Detective Lawson contacted Detective Massey of the Bartlett Police Department with this information. On September 12, 2003, he and Detective Massey went together to Ft. Lauderdale and interviewed Mr. Young.[5]

The first interview with Mr. Young lasted over two hours. Initially, his demeanor was congenial but reserved. However, when they began questioning him about the Bartlett murders, Mr. Young's demeanor changed dramatically. Detective Lawson described him as "crying almost uncontrollably" to the point of getting "violently sick" and vomiting. Eventually, Mr. Young gave them information related to the Bartlett homicides. The following day, the detectives returned for a second interview with Mr. Young. Mr. Young was very emotional during this second interview as well but gave them more information about the crimes.

Thereafter, Detective Lawson learned from the Bartlett Police Department that the Defendant had been indicted. Detective Lawson and detectives from the Bartlett Police Department traveled to Ft. Lauderdale and found the Lincoln in an apartment complex parking lot. Later, on September 17, 2003, Detective Lawson was notified that the Defendant had been arrested[6] and that the Dodge had been located, also in Ft. Lauderdale. Search warrants were obtained for both vehicles, and they were both sent to the Florida Department of Law Enforcement Crime Lab for processing. One of Mrs. James' rings was found in the back seat of the Lincoln. Three more of Mrs. James' rings were recovered from Tevarus Young's personal property at the Ft. Lauderdale jail.

Detective Lawson interviewed the Defendant at the Ft. Lauderdale Police Department after he was arrested. The Defendant waived his Miranda rights and denied any involvement in the Bartlett murders. He claimed he went to Batesville, Mississippi, and purchased the Lincoln Town Car two to three weeks before he actually picked it up. He said that he drove from Ft. Lauderdale to Batesville and took Tevarus Young with him to pick it up. He did not mention going to Bartlett, Tennessee. He said that on the way back, he left Mr. Young in Bunell, Florida, with the Dodge, and drove the Lincoln to Orlando, Florida, to "do some things." He denied leaving the keys to the Dodge with Mr.

---

[5] The testimony of Detectives Lawson and Massey is discussed together in narrative form.

[6] The record does not describe the details of the Defendant's arrest.

Young. Eventually, he returned to Bunell to retrieve the Dodge. The Defendant told Detective Lawson about the incident on I-95 south when Mr. Young was arrested.

After Detective Lawson's testimony, the State had only one remaining witness: the medical examiner. Just before the medical examiner was called to the stand, the Defendant announced to the trial court that he was going to step down and allow Mr. Gulley to take over as counsel. The trial court had the Defendant take the witness stand and directed Mr. Gulley to examine the Defendant about this latest decision. The Defendant simply stated that, "after thinking about it," he had changed his mind and wished counsel to examine the State's last witness and present his defense. He said no one had forced or coerced him into making the decision. The Defendant affirmed that he understood he had a right to represent himself and that he would be giving up control of the case. The court permitted Mr. Gulley to take over.

Before the medical examiner began testifying, Mr. Gulley objected to several of the autopsy photographs that the State intended to introduce, arguing that they were cumulative to the medical examiner's testimony, inflammatory, and unduly prejudicial. The trial court overruled the objections, finding that the probative value of the photographs to show premeditation and identity of the perpetrator outweighed any prejudicial effect.

Dr. Karen Chancellor, the Shelby County Medical Examiner, did not perform the autopsies of Mr. and Mrs. James, but she testified from the autopsy reports prepared by those who did—Dr. O. C. Smith and Dr. Teresa Campbell.[7] Dr. Chancellor testified that Mrs. James suffered from bruising to the right side of her neck consistent with the use of a cord, bruising on both shoulders, and bruising of her tongue. There were petechial hemorrhages around both eyes, on the face, and within the eyes themselves, indicative of compression of the victim's neck and asphyxia. The victim suffered from several superficial cut marks to the neck and two significant cut wounds that caused injury to the right external jugular vein, the left internal jugular vein, and the left carotid artery. These latter injuries caused significant bleeding. There were cut marks on the cervical spine bone, indicating the instrument used to cut the neck had penetrated to the bone. Both forearms had cut wounds and bruising. There were compression marks around the base of both ring fingers, but no rings. Over the defense's continued objection, the trial court admitted twelve photographs depicting cut wounds to Mrs. James' neck and both forearms, bruising to Mrs. James' neck, arms, and underarms, and indention impressions on the base of Mrs. James' ring finger. Dr. Chancellor reported that the cause of Mrs. James' death was strangulation and sharp force injuries to the neck.

---

[7] There was no objection to this testimony.

Dr. Chancellor testified that Mr. James had suffered several sharp force injuries to his neck, which included four confluent incised wounds to the front of the neck and one stab wound to the right side of the neck that penetrated the larynx and caused bleeding into the upper airway. He also had fractures to the C-4, C-5, and C-6 vertebrae, likely caused by some form of restraint that caused his head to be forced forward. Mr. James suffered compressive wounds to the front of the neck that fractured the hyoid bone, consistent with being manually strangled. He also had petechial hemorrhaging around the eyes that was common in victims who were strangled. Mr. James suffered blunt force injuries to his chest as well, which resulted in twelve fractures of eleven ribs on both sides of the chest. The chest injuries were the result of a compressive force applied to the front or the back of the body. Dr. Chancellor agreed that stomping could have caused such injuries. There were bruises on Mr. James' forearms and on his shoulder, and ligature marks on his forearm with an incise wound crossing the ligature mark. Over the defense's continued objection, the trial court admitted eight photographs depicting cut and stab wounds to Mr. James' neck, petechial hemorrhaging in Mr. James' right eye, bruising to Mr. James' right shoulder, arms and wrists, and Mr. James' cleaned rib cage with broken ribs. Dr. Chancellor opined that Mr. James' cause of death was a combination of sharp force injuries to the neck, multiple blunt force rib fractures to the chest, and compressive injury to the neck resulting in strangulation.

The defense did not cross-examine Dr. Chancellor about the injuries to the victims or their cause of death.

After Dr. Chancellor's testimony, the State rested its case. Mr. Gulley immediately made several motions. In the first, he moved for a mistrial on the basis that the Defendant should not have been allowed to represent himself, that he failed to adequately represent himself, and that the Defendant's right to represent himself was not absolute, especially in these circumstances when he was charged with multiple capital offenses. The trial court denied the motion, stating that the Defendant had an absolute right to represent himself. The court noted that it had repeatedly advised the Defendant against proceeding *pro se* and found that although proceeding without a lawyer was not a wise decision, the Defendant was nevertheless competent to make it.

In the second motion, defense counsel noted that he was not appointed as resource counsel until three months before trial and moved the court for appointment of a second attorney to assist him with the presentation of the Defendant's defense and for a mitigation expert to assist him with the gathering and presentation of mitigation evidence at the penalty phase. The trial court noted that counsel was in a difficult situation, but it was due entirely to the Defendant's actions in refusing the assistance of counsel. The court stated,

16

[H]ad he not insisted on representing himself then he probably would have had two attorneys with a lot more time to get ready but he waived all that when he insisted upon swearing this jury and getting through this trial as his own attorney.

Again, I don't think anybody in the room thinks it was a wise choice but that was his choice and his right and his privilege under our constitution to represent himself and we gave him that right and now he can't after we give him that right use that right to manipulate the system. We're going to go forward.

The court denied the motions. The court noted that since the Defendant had waived his right to counsel, technically, Mr. Gulley was not obligated to represent him, but the court would appreciate it if he would assist the Defendant. Mr. Gulley agreed to go forward.

Mr. Gulley then made a motion for judgment of acquittal, which the trial court denied. The defense presented one witness, Florence Jones, who was Lillian James' sister. Ms. Jones testified that she talked to Mrs. James on the morning of August 22, 2003, between 11:00 a.m. and noon. The defense then introduced as an exhibit a certified copy of the judgments against Tevarus Young for his role in these offenses, which reflected that he pled guilty to two counts of facilitation of first degree murder and was sentenced as a mitigated offender to two concurrent sentences of thirteen-and-one-half years of incarceration. The trial court held a hearing pursuant to Momon v. State, 18 S.W.3d 152, 162 (Tenn. 1999), during which the Defendant acknowledged and waived his constitutional right to testify in his own defense.

The defense sought to admit documentation showing that Tevarus Young was "unavailable" because he was evading process. The State objected unless the jury was also told that the Defendant was offered a continuance to give the State time to procure Mr. Young, but he declined the offer. In the end, the trial court permitted the defense to introduce the judgment sheets reflecting Mr. Young's convictions for these offenses and a certificate from the Criminal Court of the 30th District of the State of Tennessee for the arrest of Tevarus Young to appear and testify in the case. The court explained to the jury that the Defendant was offered a continuance to give the State time to locate Mr. Young, but he declined. The defense then rested its case and made a motion for a judgment of acquittal, which the trial court denied.

At the conclusion of the guilt phase, the jury found the Defendant guilty of the premeditated and felony murder of Clarence James and the premeditated and felony murder of Lillian James.

17

*III. Penalty Phase*

After the jury returned its verdicts of guilt, Mr. Gulley informed the trial court that the Defendant wanted to reassert his right to proceed *pro se*. Counsel stated that he and the Defendant disagreed over whether to present evidence in mitigation. The Defendant did not want to present any evidence in mitigation, but counsel felt he had a duty to present such evidence and intended to do so in the form of prior testimony from the Defendant's brother. The trial court advised counsel that under this Court's opinion in Zagorski v. State, 983 S.W.2d 654, 658-59 (Tenn. 1998), a competent and informed defendant had the right to waive the presentation of proof in mitigation. After a short recess to allow counsel to further consult with the Defendant on the issue, the parties returned to court where Mr. Gulley informed the trial court that the Defendant was firm in his resolve to represent himself and to not present any evidence in mitigation. The trial court conducted another *voir dire* of the Defendant to assess his competency to waive his right to present mitigation evidence. The Defendant affirmed that he wished to proceed *pro se*. After consulting with counsel, who advised him on the importance of presenting evidence in mitigation, he wished to waive that right. The court advised the Defendant against proceeding *pro se* but ultimately allowed him to resume self-representation. Mr. Gulley remained on as resource counsel.

Before beginning the penalty phase, the State proposed that the Defendant stipulate to five prior convictions out of Broward County, Florida. The Defendant objected to admission of his prior convictions but stated that he was "waiving the hearing and they can do whatever they want to do."

Thereafter, the State presented as exhibits certified copies of judgments reflecting the Defendant's prior convictions for robbery and kidnapping (Broward County, Florida Indictment No. 81-11113CF), two counts of battery of a law enforcement officer (Broward County, Florida Indictment No. 81-10611CF), and aggravated battery (Broward County, Florida Indictment No. 31-7772CF). The trial court determined that these prior convictions were for crimes of violence whose statutory elements involved violence to the person, and those documents were admitted as exhibits.

The State then offered, over the Defendant's objection that the case was still on appeal in the State of Florida, testimony from Florida Assistant State Attorney Russell Bausch. Mr. Bausch testified that the Defendant was convicted on October 6, 2013, of the first degree premeditated murder of Carlos Perez. Mr. Perez was murdered on August 27, 2003, in a motel room in Melbourne, Florida, just five days after the murders of the victims in this case. Florida detectives Johnny Lawson and Scott Dwyer testified as to the details of Mr. Perez's murder, including the facts that Mr. Perez's throat was cut and he had ligature marks on his wrists and ankles. The scene of Mr. Perez's murder had

18

been cleaned with towels and washcloths from the motel room. The furniture had been wiped clean of fingerprints, although one shoeprint was found in the bathroom. A pillow case was missing, as were Mr. Perez's clothes. Two pubic hairs found in the room were a mitochondrial DNA match to the Defendant.

The State then offered victim impact testimony from Lillian James' granddaughter, Lashaundria Kemmons, and Clarence James' granddaughter, Veronica Lewis. Both women testified concerning their relationship with the victims and the trauma of the loss suffered by family members. They each detailed the major life milestones in their lives of which the victims missed being a part, including graduations, births, and deaths of close family members.

At the conclusion of the penalty phase, the jury found the evidence sufficient to support the following aggravating circumstances: history of prior violent felony convictions, Tenn. Code Ann. § 39-13-204(i)(2) (2003); murders were heinous, atrocious or cruel, id. at (i)(5); murders were committed to avoid or prevent lawful arrest or prosecution, id. at (i)(6); murders were committed during robbery, id. at (i)(7); mass murder, id. at (i)(12); and, as to Clarence James only, the victim was seventy years of age or older, id. at (i)(14). The jury unanimously determined that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt and sentenced the Defendant to death on all four counts of first degree murder. The trial court merged the felony murder convictions into the premeditated murder convictions.

Over the Defendant's objection, Mr. Gulley was appointed to represent the Defendant for purposes of filing a motion for new trial and pursuing an appeal. Although maintaining that he wished to proceed *pro se* on appeal, the Defendant refused to sign a document waiving his right to an attorney on appeal. Accordingly, the trial court appointed James Thomas as lead counsel and Mr. Gulley as co-counsel for purposes of filing a motion for new trial and pursuing an appeal.[8] Thereafter, counsel filed a motion for new trial and the Defendant filed a *pro se* motion for new trial. The trial court considered and denied both motions. On appeal, the Court of Criminal Appeals affirmed the convictions and sentences of death. State v. Jones, No. W2015-02210-CCA-R3-DD, 2017 WL 4124164 (Tenn. Crim. App. Sept. 18, 2017).

---

[8] After the briefs were filed in this Court, Mr. Thomas was permitted to withdraw after he took a position as an Assistant District Attorney General for the 30th Judicial District. Mr. Gulley graciously agreed to continue to serve through the oral argument of this case and, despite this Court's offer to appoint a second attorney to assist him pursuant to Tennessee Supreme Court Rule 13, section 3, did not ask for the appointment of a second attorney. We commend Mr. Gulley for his willingness to serve, his participation in the S.C.A.L.E.S. project, and his excellent performance through oral argument.

## Analysis

### *I. Right to Counsel*

The Defendant asserts that the trial court erred in permitting him to represent himself in the first place and that when resource counsel ultimately took over, the trial court erred in denying the motion for a mistrial based on his own ineffective *pro se* representation or in failing to appoint a second attorney to represent him. The State responds that the Defendant knowingly and voluntarily waived his right to counsel, his self-representation did not create a manifest necessity for a mistrial, and by waiving his right to counsel, he necessarily waived his right to the appointment of a second attorney.

The standard of review for a defendant's exercise of the right of self-representation and the concurrent waiver of the right to counsel is a mixed question of law and fact. State v. Hester, 324 S.W.3d 1, 29 (Tenn. 2010). Our review is de novo with a presumption of correctness as to the trial court's factual findings. Id. at 29-30. "An error in denying the exercise of the right to self-representation is a structural constitutional error not amenable to harmless error review and requires automatic reversal when it occurs." Id. (citing State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)).

It has long been established that a criminal defendant has a constitutional right to proceed without counsel "when he voluntarily and intelligently elects to do so." Faretta v. California, 422 U.S. 806, 807 (1975); see also State v. Small, 988 S.W.2d 671, 673 (Tenn. 1999). The fact that a capital defendant faces the death penalty does not alter the availability of the right of self-representation. Hester, 324 S.W.3d at 32 (stating, "While the trial court's added concern for assuring that [the defendant] is competently represented in a capital case is understandable, it was error to prevent [the defendant] from exercising his right to self-representation on this basis. A defendant does not lose his or her right to self-representation because he is being tried for a capital offense." (citing Sherwood v. State, 717 N.E.2d 131, 135 (Ind. 1999); State v. Mems, 190 S.E.2d 164, 173 (N.C. 1972); Commonwealth v. Davido, 868 S.2d 431, 444 (Penn. 2005); State v. Brewer, 492 S.E.2d 97, 98–99 (S.C. 1997))).

However, there are three essential prerequisites that must be present before the right of self-representation becomes absolute: (1) the right must be asserted in a timely manner; (2) the request must be clear and unequivocal; and (3) the defendant must knowingly and intelligently waive the right to counsel. Id. at 30–31. A defendant need not have knowledge of the law and the legal system equivalent to that of an attorney to knowingly and intelligently waive his right to counsel. State v. Goodwin, 909 S.W.2d 35, 40 (Tenn. Crim. App. 1995) (citing Faretta, 422 U.S. at 835). The record need only

show that the defendant made his decision knowing the disadvantages and the dangers of self-representation.  Id.

"The accused's lack of expertise or professional capabilities is not a factor to be considered by the trial court when an accused invokes his constitutional right to self-representation."  State v. Herrod, 754 S.W.2d 627, 630 (Tenn. Crim. App. 1988) (citing Faretta, 422 U.S. at 836; Johnstone v. Kelly, 808 F.2d 214 (2nd Cir. 1986)).  In Faretta, the Court said that "a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation."  422 U.S. at 835.

> In other words, the accused's 'technical legal knowledge' is irrelevant to the inquiry of whether an accused should be permitted to exercise his right to self-representation; and, a court may not deny an accused the right of self-representation because the accused does not possess the basic knowledge of how a jury trial is conducted or knowledge of his rights.

Herrod, 754 S.W.2d at 630 (quoting Faretta, 422 U.S. at 836) (internal quotation marks omitted).

When a defendant asks to proceed *pro se*, the court must conduct an intensive inquiry as to his ability to represent himself.  See State v. Northington, 667 S.W.2d 57, 61 (Tenn. 1984).  To be valid, a defendant's waiver of his right to counsel "must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter."  Von Moltke v. Gillies, 332 U.S. 708, 724 (1948).  "A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered."  Id.

> Tennessee Rule of Criminal Procedure 44(b)(1) specifically provides that

> [b]efore accepting a waiver of counsel, the court shall: (A) advise the accused in open court of the right to the aid of counsel at every stage of the proceedings; and (B) determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience, and conduct of the accused, and other appropriate matters.

In addition, the waiver of counsel must be submitted in writing and made a part of the record.  Tenn. R. Crim. P. 44(b)(2) & (b)(3).

21

As summarized above, the record makes clear that the trial court conducted the appropriate inquiry and properly advised the Defendant before concluding that the Defendant had effectively waived his right to counsel. We hold that the trial court did not err in its ruling.

The Defendant contends that, for capital cases, this Court should go beyond the requirements set out in Herrod and require additional findings. He submits that permitting a *pro se* defendant to represent himself in a capital trial is never beneficial, nor should it be constitutional. The Defendant goes on to point out multiple instances in which he now claims he was ineffective. This argument is expressly precluded by this Court's decisions in Hester, 324 S.W.3d at 32, and State v. Carruthers, 35 S.W.3d 516, 551 (Tenn. 2000), both cases in which this Court addressed the capital defendants' waiver or forfeiture of their right to counsel. The record shows that the trial court repeatedly advised the Defendant of his right to counsel, strenuously discouraged the Defendant from proceeding *pro se,* and gave him multiple opportunities at various junctures during the trial to bring in counsel. In fact, as noted above, the Defendant was permitted to avail himself of the right to counsel for the examination of the medical examiner and closing arguments at the guilt phase, although he later changed his mind and resumed acting *pro se* for the sentencing phase. We hold that the Defendant knowingly and intelligently waived his right to counsel.

The Defendant next contends that, when resource counsel took over briefly for the examination of the medical examiner and closing arguments, the trial court erred by denying counsel's motion for mistrial based on ineffective representation. He contends that he had so woefully conducted his own representation that a mistrial was warranted.

A mistrial is appropriate "'to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict.'" State v. Reid, 164 S.W.3d 286, appx. 341–42 (Tenn. 2005) (quoting State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)). The decision whether to grant a mistrial lies within the discretion of the trial court, and "'[t]his Court will not interfere with the trial court's decision absent a clear abuse of discretion on the record.'" State v. Bell, 512 S.W.3d 167, 187 (Tenn. 2015) (quoting State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002)), cert. denied 136 S. Ct. 2006 (U.S. May 16, 2016). "'Normally, a mistrial should be declared only if there is a manifest necessity for such action.'" Id. (quoting State v. Saylor, 117 S.W.3d 239, 250 (Tenn. 2003)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" Id. (quoting State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The party seeking a mistrial has the burden of establishing its necessity." Id. (citing State v. Banks, 271 S.W.3d 90, 137 (Tenn. 2008)).

A defendant who knowingly and intelligently waives the right to counsel cannot later allege the denial of effective assistance of counsel because of his own poor performance. See Carruthers, 35 S.W.3d at 551. As the Court of Criminal Appeals pointed out below, to declare a mistrial under these circumstances would only encourage future defendants to delay their trial indefinitely by flip-flopping on the decision to proceed *pro se*. Additionally, as this Court noted in Carruthers, "when a defendant forfeits or waives the right to counsel, . . . he or she also forfeits or waives the right to effective assistance of counsel." Id.

The Defendant was the author of his own fate, and "[n]othing is better settled than the rule that an appellant cannot take advantage of errors which he committed, invited or induced the trial court to commit." State v. Jones, 733 S.W.2d 517, 521 (Tenn. Crim. App. 1987) (citing Gentry v. Betty Lou Bakeries, 100 S.W.2d 230, 231 (Tenn. 1937)). The Defendant has failed to establish that the trial court erred by denying his request for a mistrial.

The Defendant also contends that the trial court erred, when resource counsel took over, in failing to appoint a second attorney. Although the Defendant earlier had expressly waived his right to counsel, once he requested counsel and Mr. Gulley took over, Mr. Gulley moved for the assistance of a second attorney, which the trial court denied.

Tennessee Supreme Court Rule 13, section 3(b)(1) provides for appointment of two attorneys in capital cases. However, as the Court of Criminal Appeals pointed out below, this is not a rule of constitutional dimension—there is no "per se" right to the assistance of two attorneys in capital cases. Hester, 324 S.W.3d at 35 (citing Bell v. Watkins, 692 F.2d 999, 1009 (5th Cir. 1982); Arrington v. State, 687 S.E.2d 438, 448 (Ga. 2009); Davis v. State, 743 So. 2d 326, 340–41 (Miss. 1999)). Moreover, the Defendant's waiver of his right to counsel necessarily included the waiver of the right to two attorneys. Furthermore, appointment of a second attorney at this point would have been futile. Without time to review the evidence and without participating in the trial up to that point, any assistance provided by a second attorney would have been minimal at best. The trial court did not abuse its discretion in denying the motion for a second attorney.

*II. Former Testimony of Tevarus Young*

The Defendant asserts that the trial court erred in finding that Mr. Young was unavailable as a witness, by instructing the jury that the Defendant could have agreed to a continuance to allow the State to locate Mr. Young, and by allowing into evidence Mr. Young's testimony that the Defendant raped him. The State responds that, after its good

23

faith efforts to locate Mr. Young and bring him to court failed, the trial court properly determined that Mr. Young was unavailable for purposes of introducing his prior testimony at trial. As for the Defendant's claim that the court erred by instructing the jury that he had objected to a continuance for the State to try to locate Mr. Young, the State points out that the Defendant affirmatively agreed to this instruction at trial as part of an agreement that the jury also would be instructed that Mr. Young was evading service of process. By acquiescing in the trial court's instruction, the State contends, the Defendant waived his right to claim this issue as "plain error."

"Generally, this Court reviews a trial court's decisions regarding the admissibility of evidence for an abuse of discretion." State v. Davis, 466 S.W.3d 49, 61 (Tenn. 2015) (citing State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010)). "A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." Id. (citing State v. Clark, 452 S.W.3d 268, 287 (Tenn. 2014)).

Prior testimony is considered hearsay, defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Subject to the exceptions set forth in Tennessee Rules of Evidence 803 and 804, hearsay generally is not admissible. Tenn. R. Evid. 802. "Prior statements of witnesses . . . constitute hearsay evidence if offered for the truth of the matter asserted therein." State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (citing Mays v. State, 495 S.W.2d 833 (Tenn. Crim. App. 1972); Johnson v. State, 596 S.W.2d 97 (Tenn. Crim. App. 1979)).

Tennessee Rule of Evidence 804 provides a hearsay exception for the former testimony of a declarant who is unavailable as a witness if the testimony was

> given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

Tenn. R. Evid. 804(b)(1). "'Unavailability of a witness' includes situations in which the declarant . . . is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a)(5).

Trial courts must conduct layered inquiries when determining the admissibility of

24

evidence objected to on the grounds of hearsay, and our standard of review varies accordingly:

> Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. State v. Gilley, 297 S.W.3d [739,] 759–61 [(Tenn. Crim. App. 2008)]. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to de novo review. State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015).

Intertwined with the rules on the admissibility of hearsay is the constitutional right to confront witnesses. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9; see also Crawford v. Washington, 541 U.S. 36, 51 (2004); State v. Brown, 29 S.W.3d 427, 430–31 (Tenn. 2000). This includes the right to physically face the witness and the right to cross-examine the witness. Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); Brown, 29 S.W.3d at 430–31. Accordingly, a witness's prior testimony against a criminal defendant is inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity to cross-examine the witness. See Crawford, 541 U.S. at 53–54.

In order to satisfy the right to confrontation when the State seeks to admit prior testimony of an unavailable witness, the State must show that the witness is truly unavailable after good faith efforts were made to obtain the witness's presence. See State v. Sharp, 327 S.W.3d 704, 709, 712 (Tenn. Crim. App. 2010) (citing State v. Henderson, 554 S.W.2d 117, 120 (Tenn. 1997); State v. Armes, 607 S.W.2d 234, 236–37 (Tenn. 1980)). "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." Ohio v. Roberts, 448 U.S. 56, 74 (1980), overruled on other grounds by Crawford, 541 U.S. 36. "Good faith" contemplates "'[t]he lengths to which the prosecution must go to produce a witness . . . [and] is a question of reasonableness.'" Id. (quoting California v. Green, 399 U.S. 149, 189 n.22 (1970)). We review a trial court's determination regarding the absent witness's

25

unavailability for an abuse of discretion. <u>Sharp</u>. 327 S.W.3d at 712 (citing <u>Hicks v. State</u>, 490 S.W.2d 174, 179 (Tenn. Crim. App. 1972)).

The Defendant contends that, by delaying until one month prior to trial before trying to find Tavarus Young, the State failed to make a good faith effort to locate him, and, as a result, his prior testimony should not have been admitted. The evidence shows that, approximately one month before trial, the State contacted multiple jurisdictions in Florida, where Mr. Young was believed to be living. The Florida authorities found an address for Mr. Young's mother, and she provided his phone number. One of the prosecutors called Mr. Young in early April 2015, and Mr. Young stated that he would not return to Tennessee to testify. The State provided multiple emails between the State of Tennessee and the State of Florida reflecting the law enforcement attempts to locate Mr. Young. Mr. Young's photograph also was posted in a Florida newspaper in an effort to obtain the assistance of the general public in finding him. The State filed two petitions, on April 13, 2015, and on May 4, 2015, to secure Mr. Young's presence at trial. Based on those petitions, and pursuant to the Law to Secure Witnesses, the trial court issued certificates to secure Mr. Young's presence in court for the Defendant's trial. In the second certificate, the court stated that Mr. Young appeared to be evading service of process and had indicated his unwillingness to appear and testify. The court ordered that Mr. Young be immediately taken into custody and delivered to Tennessee. The Circuit Court of the Eleventh Judicial District in Miami, Dade County, Florida, received the certificates issued by the trial court and issued a summons for Mr. Young. However, the Florida court found that Mr. Young was "actively evading service of the summons to appear." A summons was served on Mr. Young's mother, and, when he nevertheless failed to appear in the Florida court pursuant to that summons, the Florida court ordered his arrest. Law enforcement continued to try to locate Mr. Young by contacting his relatives in Florida and a previous girlfriend in Oklahoma, all to no avail. The prosecutor explained that Mr. Young could not be located and that he was unaware of any other efforts the State could make to secure his presence. The efforts to locate Mr. Young continued even after the trial began.

The record establishes that the State made multiple good-faith efforts to locate Mr. Young and secure his presence at trial. We conclude that the trial court did not abuse its discretion in determining that Mr. Young was unavailable.

Next, the Defendant contends that the trial court erred by instructing the jury that he could have agreed to a continuance to allow the State to locate Mr. Young. Prior to the reading of Mr. Young's testimony, the trial court explained to the jury that the State would be introducing the testimony of a witness from a prior hearing because the witness was unavailable. The court expressly informed the jury that it had found the witness was unavailable, that the prior testimony had been given under oath in a prior courtroom

26

hearing, that the Defendant had been involved in the prior proceeding and had the opportunity to cross-examine the witness at that prior proceeding, and that the Defendant had been represented by counsel at the prior proceeding. Before introduction of Mr. Young's testimony and out of the presence of the jury, the Defendant asked whether the court was going to inform the jury why Mr. Young was not present. The court responded that it was not going to give the jury any additional information. Mr. Young's testimony was then read to the jury in question and answer format.

At the conclusion of the State's proof and following the Momon hearing at which he waived his right to testify, the Defendant sought to admit documentation showing that Mr. Young was unavailable because he was evading process. The State objected on the basis that it was unfair to let the jury know that Mr. Young was evading process without also letting it know that the State had offered a continuance to procure Mr. Young but that the Defendant declined a continuance. In the end, the trial court agreed to accommodate both parties. The court permitted the Defendant, for the purpose of showing that Mr. Young was evading process, to introduce a certificate of the criminal court for the arrest of Mr. Young to appear and testify. The court then told the jury:

> Now, ladies and gentlemen, that's a document that pertains to the efforts to obtain the appearance of Mr. Young here in court.

> I've already told you previously that as a matter of law I have ruled that Mr. Young's transcript of his prior sworn testimony could be admitted into evidence because it fell within what we call a well-recognized exception to the hearsay rule when a witness is unavailable.

> Mr. Young was unavailable. The State made what we call under the law diligent and good faith effort to produce Mr. Young through service of process but was unable to do so at the time of this trial.

> And since that made him legally unavailable for the trial and since he had given his testimony prior in a court in which he was sworn to tell the truth and which Mr. Jones was a party and had counsel there cross-examining and confronting that witness then that made it legally admissible.

> Also, we decided to go through as far as the good faith efforts of the State are concerned, at the time this case was set for trial, the State offered to continue to try to look for him and continue the case for a few weeks in order to try to find him but it was the Defendant who insisted to go to trial this week with Mr. Young not being able to be served at this time. And

27

beyond that, that's really all I think I want to tell you about the legal rulings.

I normally don't tell the jury about these legal rulings, but the parties at least have asked that some of this stuff that normally the jury doesn't hear, that you hear about, so I thought I would tell you the whole story.

There was no contemporaneous objection to this instruction, and the defense thereafter rested its case.

The Defendant contended in the Court of Criminal Appeals and contends here that this instruction had the effect of improperly imposing on him the burden of finding Mr. Young or continuing the case to allow the State to find him. The State responds that the Defendant invited this instruction when he requested that the jury be instructed that Mr. Young was evading service so as to impugn Mr. Young's credibility, because to omit the fact that the Defendant could have waited until Mr. Young was found would have been unfair. The Court of Criminal Appeals concluded that the trial court "diminutively erred" by instructing the jury in this fashion[9] but that the error did not result in prejudice and, thus, did not rise to the level of reversible error. Jones, 2017 WL 4124164, at *14.

In view of the fact that the Defendant did not object to this instruction and, in fact, appeared to be in agreement with the trial court's resolution of the issue, we agree with the State's characterization of the issue as waived. See Tenn. R. App. P. 3(e), 36(a). As the State points out, the Defendant does not acknowledge his acquiescence in the trial court's action on this point and fails to argue that the instruction was plain error. We hold that the Defendant is not entitled to relief on this issue.[10]

Next, the Defendant argues that the trial court erred in allowing into evidence that portion of Mr. Young's testimony indicating that the Defendant raped him. The State points out that the testimony of Mr. Young was identical to that presented at the Defendant's first trial, and thus, the Defendant should have been aware of it and should have objected to it before it was read into evidence. His failure to do so, it argues, resulted in waiver of the issue pursuant to Tennessee Rule of Appellate Procedure 36(a)

---

[9] The Court of Criminal Appeals found error because the trial court did not expressly tell the jury that Mr. Young was intentionally evading service. Jones, 2017 WL 4124164, at *14. However, we note that the document admitted as Exhibit 83, the court order directing Mr. Young's arrest and compelling his appearance for trial, expressly stated that "Tevarus Young appears to be evading process on this case . . . and has indicated his unwillingness to appear and testify."

[10] We disagree with the Court of Criminal Appeals that the trial court's handling of this issue constituted "diminutive error" or any level of error.

28

("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also State v. Jones, 15 S.W.3d 880, 895 (Tenn. Crim. App. 1999) (defendant waived issue of improper admission of prior bad act because he made no objection and did not request a jury-out hearing).

Although conceding that he did not object to that portion of Mr. Young's testimony, the Defendant argues that admission of this prior bad act evidence was plain error because it was not relevant and its probative value was outweighed by the danger of unfair prejudice. The State argues that plain error review is not warranted because the Defendant failed to show the breach of a clear and unequivocal rule of law. Additionally, even if the testimony was erroneously admitted, given the overwhelming evidence of the Defendant's guilt, the Defendant failed to demonstrate that the evidence adversely affected a substantial right or that consideration of the alleged error is necessary to do substantial justice. The State also argues that the fact of the rape was relevant to show that Mr. Young remained with the Defendant after the murders only because he was afraid of the Defendant and that the rape was a way for the Defendant to exercise control over Mr. Young. Thus, it would have been within the trial court's discretion to admit the testimony.

Tennessee Rule of Evidence 404(b) precludes the admission of an accused's prior bad acts absent certain exceptions. It provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Id.

The rationale underlying Rule 404(b) is that admitting evidence of an accused's other crimes, wrongs, or bad acts carries an inherent risk of the jury convicting him of the charged crime based upon his "bad character" or propensity to commit a crime rather than upon the strength of the evidence. State v. Dotson, 450 S.W.3d 1, 76 (Tenn. 2014); State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994). However, such evidence may be admitted for other purposes if relevant to some "material issue" in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b)(2) & (b)(4). "'[O]ther purposes' have been defined to include (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation." State v. Berry, 141 S.W.3d 549, appx. 582 (Tenn. 2004); see also Neil P. Cohen, et al., Tennessee Law of Evidence § 4.04[7][a] (6th ed. 2011 & Supp. 2017).

Had the Defendant timely objected to that portion of Mr. Young's testimony concerning the alleged rape, the trial court would have been obligated to hold a 404(b) hearing outside the presence of the jury to determine its admissibility. Given the Defendant's concession that he failed to object to this evidence at trial, our review is for plain error. For an appellate court to grant relief on the basis of plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting and adopting the test established by State v. Adkisson, 899 S.W.2d 626, 641–42 (Tenn. Crim. App. 1994)). A defendant must establish all five factors before this Court will grant plain error relief, and we may cease our review upon concluding that any of the five factors is not established. Id. at 283.

We conclude that, given the overwhelming evidence of the Defendant's guilt, this passing reference to another alleged bad act by the Defendant did not influence the jury's verdict. Accordingly, no substantial right of the Defendant was adversely affected and consideration of the alleged error is not necessary to do substantial justice. The Defendant is entitled to no relief on this basis.

### III. Sufficiency of the Evidence

The Defendant contends that because the only evidence that he committed the crime came from Mr. Young, the Court should conclude that the evidence is insufficient

to sustain his convictions.

In conducting a review of the sufficiency of the evidence, our inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding . . . of guilt beyond a reasonable doubt.").

After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence is insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

An appellate court does not weigh the evidence anew. Evans, 838 S.W.2d at 191. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). "[T]he State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. This "standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

When the only proof of a crime is the uncorroborated testimony of an accomplice, the evidence is insufficient to sustain a conviction as a matter of law. State v. Collier, 411 S.W.3d 886, 894 (Tenn. 2013) (citing State v. Little, 402 S.W.3d 202, 211–12 (Tenn. 2013)). This Court has defined the term "accomplice" to mean "one who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." Id. (citing State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004); Clapp v. State, 30 S.W. 214, 216 (Tenn. 1895)). The test for whether a witness qualifies as an accomplice is "'whether the alleged accomplice could be indicted for the same offense charged against the defendant.'" Id. (quoting Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)).

Although a defendant cannot be convicted solely upon the uncorroborated testimony of an accomplice, "'corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.'" State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001) (emphasis deleted) (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). Corroborative evidence must lead to the inferences that a crime has been

committed and that the defendant is implicated in the crime. Id.

The trial court instructed the jury to determine whether Mr. Young was an accomplice, and further instructed it that, if it found he was an accomplice, there must be other corroborating evidence to support his testimony. The State does not disagree that Mr. Young's admitted participation in the offenses was sufficient to render him an accomplice in the murders of Mr. and Mrs. James. It simply contends that Mr. Young's testimony was adequately corroborated and established the elements of each offense.

Mr. Young testified that he traveled with the Defendant from Florida to the victims' home in Tennessee and was present when the Defendant killed the victims. He provided details about how they met Mr. James sitting on a chair in his garage, a habit several witnesses testified that Mr. James engaged in daily. Mr. Young provided accurate details about the interior of the victims' home and the manner in which the Defendant robbed and killed the victims. Although he did not witness the Defendant kill Mr. James, Mr. Young stated that he saw Mr. James in the laundry room lying in a pool of blood with his hands tied behind his back. Officer Devers testified that he found Mr. James in this condition. According to Mr. Young, the Defendant bound, strangled, and slit the throat of Mrs. James, which was corroborated by the medical examiner. The Defendant then cleaned the scene and took various items from the home, facts corroborated by photographs from the scene showing an open linen closet and watered-down blood spots in the bathroom sink. Mr. Young expressly recalled the Defendant's removing Mrs. James' rings from her fingers, a fact corroborated by indentation marks on her fingers, a ring recovered in the Lincoln Town Car, and the rings later recovered from Mr. Young's property at the Ft. Lauderdale jail and identified by Mrs. James' daughter. After leaving the victims' home, Mr. Young said he and the Defendant stopped for gas, then went shopping at a nearby mall. Lillian James' credit card was used at 3:18 p.m. on the afternoon of August 23, 2003, at a gas station near the victims' home, corroborating this portion of Mr. Young's testimony. The two men then drove south and stopped at a car lot in Batesville, Mississippi, where the Defendant purchased a white Lincoln Town Car. The Defendant left the lot in the Lincoln, and Mr. Young followed in the Defendant's Dodge Aries K-car. Car lot co-owner Michael Smith corroborated the Defendant's presence and purchase of the Lincoln from his Batesville lot. A credit card transaction associated with Lillian James' credit card occurred at 7:56 p.m. at a gas station less than five miles from the car dealership. The Defendant and Mr. Young then drove back to Florida, stopping several times for gas and paying each time with Lillian James' credit card at the pump. Credit card receipts corroborated the route taken, and surveillance footage from the gas station/markets showed the time correlation of the credit card transactions with the presence of a white Lincoln and a light-colored Dodge. At 8:12 a.m. on August 24, 2003, Mrs. James' credit card was used at a gas station in Melbourne, Florida. Again, surveillance footage from that station showed a Dodge Aries K-car and a

white Lincoln that appeared to be traveling together. Mr. Young testified that, eventually, in an effort to get away from the Defendant, he began driving erratically until he caught the attention of a law enforcement officer, who stopped him. This episode was corroborated by Officer Carlos Reyes of Brevard County, Florida, who made the traffic stop in question. Officer Reyes testified that during the stop, the Defendant approached in a white Lincoln Town Car and told him that Mr. Young was driving the Dodge to Ft. Lauderdale for him.

Furthermore, several other witnesses placed the Defendant in Memphis on the day of the murders. Diane and Wesley Armstrong both testified to their encounters with the Defendant on a Friday morning in August 2003. They both described the car as a white Dodge K-car and his traveling companion as a tall skinny African-American man with braids, a description that matched Mr. Young's appearance at the time. A former neighbor of the Defendant's, Justin Turberville, also recalled seeing the Defendant in the Bartlett neighborhood on the Friday before the crimes.

This corroborative evidence, which confirmed Mr. Young's testimony as to the events before, during, and after the murders of Mr. and Mrs. James, fairly and legitimately tends to connect the Defendant with these crimes. See Bane, 57 S.W.3d at 419. Accordingly, Mr. Young's testimony clearly was adequately corroborated.

Furthermore, Mr. Young's testimony, considered with the other evidence at trial, was sufficient for a rational trier of fact to find the essential elements of each offense beyond a reasonable doubt. The offenses at issue are first degree premeditated murder and first degree felony murder. Premeditated murder, defined as the "premeditated and intentional killing of another," Tenn. Code Ann. § 39-13-202(a)(1) (2003), "may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment,'" State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting Tenn. Code Ann. § 39-13-202(d)). Felony murder is defined, in relevant part, as "[a] killing of another committed in the perpetration of or attempt to perpetrate . . . [a] robbery." Tenn. Code Ann. § 39-13-202(a)(2). For a felony murder conviction, "[n]o culpable mental state is required . . . except the intent to commit" the underlying offense, id. § 39-13-202(b), which in this instance is robbery.

"Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). Mr. Young testified that he witnessed the Defendant murder Mrs. James and observed the body of Mr. James after the Defendant had been alone with him just moments before. The evidence established that the Defendant used weapons, including a knife and rope, upon unarmed victims who were particularly vulnerable because of their ages. The Defendant's method of killing Mr. and Mrs. James—which involved binding, strangling,

33

and throat cutting—was especially cruel.  The Defendant explained to Mr. Young that he had killed Mrs. James because she had seen his face.  The Defendant's robbery of the James' money, credit cards, and jewelry indicates another motive for the murders.  After the murders, the Defendant methodically and calmly attempted to clean the crime scene before leaving.  His statements and conduct are indicative of premeditation and, taken together, provide a basis for a rational trier of fact to infer that the murders were committed "after the exercise of reflection and judgment," as required by Tennessee Code Annotated section 39-13-202(d).  See Leach, 148 S.W.3d at 53–54 (noting that circumstances which may support a finding of premeditation include the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the destruction or secretion of evidence of the killing, a defendant's calmness after the killing, and the motive for the killing).  As a result, the evidence adequately supports the Defendant's convictions for the first degree premeditated murders of Mr. and Mrs. James.

As to the felony murder convictions, the evidence demonstrated that the Defendant used violence to accomplish the theft of two billfolds from Mr. James and the theft of money, credit cards, and jewelry from Mrs. James. The proof further established that Mr. and Mrs. James died as a result of injuries sustained from the Defendant's use of violence.  Accordingly, the evidence supports the Defendant's convictions for the first degree felony murders of Mr. and Mrs. James during the perpetration of a robbery.

### IV. Denial of a Mitigation Expert

The Defendant asserts that the trial court erred in denying the appointment of a mitigation expert.  The State responds that the appellate record is insufficient to allow review of this issue but that, even if the record was sufficient, the Defendant failed to show a particularized need for such an expert and that furthermore, he waived this issue by declining to present mitigation evidence during the penalty phase.

> [T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be *precluded* from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

Lockett v. Ohio, 438 U.S. 586, 604 (1978) (emphasis added, emphasis deleted, footnote deleted); see also Penry v. Johnson, 532 U.S. 782, 797 (2001); Skipper v. South Carolina, 476 U.S. 1, 4–5, 8 (1986); Eddings v. Oklahoma, 455 U.S. 104, 112 (1982).  There is no question that capital defendants have a constitutionally protected right to provide a jury with mitigation evidence that humanizes the defendant and assists the jury in accurately determining a defendant's moral culpability for the crime.  See Porter v. McCollum, 558

34

U.S. 30, 41 (2009).

However, the fact that a capital defendant has a constitutional right to present evidence in mitigation is separate from the question of whether such a defendant has a constitutional right to a mitigation expert. The Defendant has cited to no authority expressly stating so. Pursuant to statute,

> [i]n capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, the court in an *ex parte* hearing may, *in its discretion*, determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

Tenn. Code Ann. § 40-14-207(b) (2012) (second emphasis added). This Court's own rules, in turn, provide that

> [i]n the trial and direct appeal of all criminal cases in which the defendant is entitled to appointed counsel . . . the court, in an *ex parte* hearing, may *in its discretion* determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

Tenn. Sup. Ct. R. 13, §5(a)(1) (second emphasis added).

"To warrant reversal for failure of a trial court to allocate resources for expert assistance, a defendant must show the existence of a 'particularized need' for the allocation of resources for expert assistance." Hester, 324 S.W.3d at 47 (citing State v. Dellinger, 79 S.W.3d 458, 469 (Tenn. 2002); State v. Barnett, 909 S.W.2d 423, 430 (Tenn. 1995); State v. Shepherd, 902 S.W.2d 895, 904 (Tenn. 1995); Evans, 838 S.W.2d at 192); see also State v. Smith, 993 S.W.2d 6, appx. 28 (Tenn. 1999).

"In order to demonstrate a particularized need, a defendant must first establish that he or she will not have a fair trial without the requested expert assistance." Hester, 324 S.W.3d at 47 (citing Dellinger, 79 S.W.3d at 469; State v. Scott, 33 S.W.3d 746, 753 (Tenn. 2000); Barnett, 909 S.W.2d at 430–31). "The defendant must also establish that there is a reasonable likelihood that the requested expert assistance will materially assist him or her in preparing or presenting his or her case." Id. (citing Dellinger, 79 S.W.3d at 469; Scott, 33 S.W.3d at 753; Barnett, 909 S.W.2d at 430–31).

35

Tennessee Supreme Court Rule 13 also provides that

[p]articularized need cannot be established and funding requests should be denied where the motion contains only:

(A) undeveloped or conclusory assertions that such services would be beneficial;

(B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;

(C) information indicating that the requested services relate to factual issues or matters within the province and understanding of the jury; or

(D) information indicating that the requested services fall within the capability and expertise of appointed counsel.

Tenn. Sup. Ct. R. 13, § 5(c)(4) (citing State v. Barnett, 909 S.W.2d 423, 430 (Tenn. 1995); Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985); State v. Abraham, 451 S.E.2d 131, 149 (N.C. 1994)).

First, we note that, although the Defendant, before waiving his right to counsel, filed an *ex parte* motion requesting funding for a mitigation expert and the trial court conducted a hearing on the matter, neither the motion nor a transcript of the hearing is included in the appellate record. The technical record contains only the trial court's order denying funding, which justified its decision on the basis that the court had already appointed two lawyers and a fact investigator, any one of whom was capable of conducting an investigation into mitigation evidence, and that the appointment of a mitigation expert would not assist the Defendant in any way.

Capital defendants do not have an inherent statutory or constitutional right to a mitigation expert, although circumstances may arise in which a particularized need for a mitigation expert would require the appointment of such an expert. Absent a showing of any special need, there is no constitutional violation in the denial of a capital murder defendant's request for funds for a mitigation expert. We hold that, on the basis of this record, the Defendant failed to show a particularized need for a mitigation expert.[11]

---

[11] We also note that the Defendant expressly waived his right to present evidence in mitigation, although there was mitigation evidence available in the form of prior testimony from his first trial.

*V. Mandatory Review of Death Sentence*

This Court is statutorily required to review the Defendant's death sentences. Tenn. Code Ann. § 39-13-206(a)(1) (2014). Our review includes analyzing whether (1) either death sentence was imposed in any arbitrary fashion; (2) the evidence supports the jury's findings of statutory aggravating circumstances; (3) the evidence supports the jury's finding that the aggravating circumstances outweighed any mitigating circumstances; and (4) the capital sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant. Id. § 39-13-206(c)(1)(A)–(D).

A. Arbitrariness in Imposition of Death Penalty

The Defendant contends that his capital trial was not conducted pursuant to the applicable statutory provisions and rules of criminal procedure. Specifically, he asserts that he was denied the right to the assistance of two qualified capital attorneys and denied the resources to adequately prepare mitigation evidence for the penalty phase of trial. As discussed above, the Defendant's knowing waiver of the right to counsel and insistence on proceeding *pro se* necessarily resulted in his waiver of the right to two attorneys. As to the denial of the assistance of a mitigation expert, the Defendant failed to make the requisite showing of a particularized need for such expert. Moreover, although he had access to the mitigation evidence prepared for his first trial, he chose to waive the presentation of any mitigation evidence during the penalty phase. That the Defendant waived these rights did not render these capital proceedings arbitrary.

B. Aggravating Circumstances

Tennessee law provides that no sentence of death or imprisonment for life without parole shall be imposed by a jury but upon a unanimous finding that the State has proven beyond a reasonable doubt the existence of one or more aggravating circumstances and that those aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(g)(1) (2003).

After deliberation, the jury returned sentences of death after finding that the State had proven the following aggravating circumstances beyond a reasonable doubt:

> (2) The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;
>
> . . . .

37

(5) The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;

(6) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another;

(7) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb;

. . . .

(12) The defendant committed "mass murder," which is defined as the murder of three (3) or more persons whether committed during a single criminal episode or at different times within a forty-eight-month period;

and, as to Mr. James only, that

(14) The victim of the murder was seventy (70) years of age or older[.]

Tenn. Code Ann. § 39-13-204(i). We examine the proof supporting each of these aggravating circumstances in turn.

### 1. Previous Convictions for Violent Felonies

Tennessee Code Annotated section 39-13-204(i)(2) provides that one of the aggravating circumstances that may justify the imposition of the death penalty is "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." This Court has construed the word "violence" as "physical force unlawfully exercised so as to injure, damage or abuse." State v. Fitz, 19 S.W.3d 213, 217 (Tenn. 2000).

The State presented as exhibits certified copies of judgments reflecting the Defendant's prior Broward County, Florida, convictions for robbery and kidnapping, two counts of battery of a law enforcement officer, and aggravated battery. The trial court determined that these prior convictions were for crimes of violence whose statutory

38

elements involved violence to the person, and the Defendant did not contest this characterization. The State also offered testimony from a Florida Assistant State Attorney who prosecuted the case in which the Defendant was convicted in Florida on October 6, 2013, of the first degree premeditated murder of Carlos Perez in Melbourne, Florida. Florida detectives testified as to the details of the murder, including the fact that Mr. Perez's throat was cut. First degree murder is undoubtedly a crime involving violence to the person. Taken together, this evidence clearly established aggravating circumstance (i)(2), that the Defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence against the person.

## 2. Heinous, Atrocious, or Cruel

Tennessee Code Annotated section 39-13-204(i)(5) provides that another of the aggravating circumstances that may justify the imposition of the death penalty is when "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." "The (i)(5) aggravating circumstance may be applied if the evidence is sufficient to support *either* torture *or* serious physical abuse beyond that necessary to produce death." State v. Rollins, 188 S.W.3d 553, 572 (Tenn. 2006) (citing State v. Suttles, 30 S.W.3d 252, 262 (Tenn. 2000)). This Court has defined torture as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Willis, 496 S.W.3d 653, 730–31 (Tenn. 2016) (citing State v. Pike, 978 S.W.2d 904, 917 (Tenn. 1998); State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985)). "[S]erious physical abuse beyond that necessary to produce death" means just what it says; there must be serious physical, not mental, abuse, "and it must be 'beyond that' or more than what is 'necessary to produce death.'" State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996). Moreover, abuse is "an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.'" Id. (quoting Black's Law Dictionary 11 (6th ed. 1990)). The law does not require that jurors agree as to which theory supports their view that the murder is "especially heinous, atrocious, or cruel." State v. Keen, 31 S.W.3d 196, 209 (Tenn. 2000).

The proof established that both victims were bound and strangled before their throats were cut multiple times. Mrs. James's head was almost completely severed from her body. Mr. James suffered multiple broken ribs, which was consistent with the Defendant having stomped on him. For both victims, this proof established aggravating circumstance (i)(5), that the killings were heinous, atrocious, or cruel in that they involved torture or serious physical abuse beyond that necessary to produce death.

### 3. Preventing Lawful Arrest or Prosecution

Tennessee Code Annotated section 39-13-204(i)(6) provides that one of the aggravating circumstances that may justify the imposition of the death penalty is when "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." This aggravating circumstance "focuses on a defendant's motives in committing a murder." State v. Reid, 164 S.W.3d 286, 315 (Tenn. 2005). Although there must be some "particular proof" supporting this aggravating circumstance, see State v. Hartman, 42 S.W.3d 44, 58 (Tenn. 2001), the State need not prove that the defendant's desire to avoid prosecution was his sole motive in murdering the victim, Terry v. State, 46 S.W.3d 147, 162 (Tenn. 2001).

Mr. Young testified that when he asked the Defendant why he killed Mrs. James, the Defendant responded that it was because she had seen his face. Although there was no evidence that the Defendant made a similar remark concerning Mr. James, his response to the question why he killed Mrs. James gives rise to the inference that he killed both victims to insure they would not identify him as the person who robbed them. This proof is sufficient to establish aggravating circumstance (i)(6), that both murders were committed for the purpose of avoiding prosecution.

### 4. Felony Murder

Another aggravating circumstance that may justify the imposition of the death penalty is when "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any . . . robbery[.]" Tenn. Code Ann. § 39-13-204(i)(7).[12] The Defendant took large amounts of cash, at least one credit card, and jewelry from the victims. Thus, the proof clearly established that the killings occurred during the course of a robbery, establishing, as to both victims, aggravating circumstance (i)(7), that the murders were

---

[12] When it charged the jury on this felony murder aggravating circumstance, the trial court did not limit the statutory list of underlying felonies to "committing or attempting to commit, any . . . robbery." Instead, the trial court charged all of the underlying felonies included in aggravating circumstance (i)(7). See Tenn. Code Ann. § 39-13-204(i)(7). This was error. See State v. Blanton, 975 S.W.2d 269, 281 (Tenn. 1998) (stating that "charging all felonies under (i)(7) without regard to whether the felonies are supported by the evidence is error"); see also State v. Van Tran, 864 S.W.2d 465, 479 (Tenn. 1993) (reiterating that "a trial court should charge only those aspects of an aggravating circumstance supported by the evidence in a case") (citing State v. Pritchett, 621 S.W.2d 127, 140 (Tenn. 1981)). The Defendant, however, is entitled to no relief on the basis of this error because the application of this aggravating circumstance was "amply supported by the evidence." Blanton, 975 S.W.2d at 281. We are convinced beyond a reasonable doubt that the erroneous inclusion of inapplicable underlying felonies had no effect on the result. See Van Tran, 864 S.W.2d at 479.

knowingly committed while the Defendant had a substantial role in committing robbery.

### 5. Mass Murder

Tennessee Code section 39-13-204(i)(12) provides as an aggravating circumstance to justify imposition of the death penalty that "[t]he defendant committed 'mass murder,' which is defined as the murder of three (3) or more persons, whether committed during a single criminal episode or at different times within a forty-eight-month period." In addition to proof of the murders of Clarence and Lillian James, the State introduced evidence that the Defendant murdered Carlos Perez in Florida within days of murdering these victims. The Defendant does not contest the sufficiency of the proof for this aggravating circumstance. Given the proof, the State clearly established, for both victims, aggravating circumstance (i)(12), the mass murder aggravating circumstance.

### 6. Victim Over Seventy Years of Age

Finally, Tennessee Code section 39-13-204(i)(14) provides as an aggravating circumstance to support imposition of the death penalty that "[t]he victim of the murder was seventy (70) years of age or older . . . ." As to Clarence James only, the medical examiner testified that Mr. James was eighty-two years old, thus supporting the application of this aggravating circumstance.

### C. Aggravating Circumstances Outweigh Mitigating Circumstances

We also are statutorily required to assess whether "[t]he evidence supports the jury's finding that the aggravating . . . circumstances outweigh any mitigating circumstances." Tenn. Code Ann. § 39-13-206(c)(1)(C). In this case, the Defendant waived presentation of mitigating circumstances. Given that fact, we agree with the jury's decision that the aggravating circumstances—five in the case of Mrs. James and six in the case of Mr. James—outweighed the mitigating circumstances beyond a reasonable doubt.

### D. Proportionality Review

Finally, we are statutorily required to review the Defendant's sentence of death in order to determine whether it is excessive or disproportionate to the penalty imposed in similar cases. Tenn. Code Ann. § 39-13-206(c)(1)(D). "Our review is intended to determine whether the Defendant's death sentence is aberrant, arbitrary, or capricious insofar as it is 'disproportionate to the punishment imposed on others convicted of the same crime.'" Bell, 512 S.W.3d at 207-08 (quoting State v. Bland, 958 S.W.2d 651, 662 (Tenn. 1997)); see also State v. Pruitt, 415 S.W.3d 180, 212–17 (Tenn. 2013) (re-

affirming the Bland analysis). Our review employs the precedent-seeking method of comparative proportionality review, in which we compare this case with other cases involving similar crimes and similar defendants. The pool of cases into which we peer consists of "those first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death." State v. Rice, 184 S.W.3d 646, 679 (Tenn. 2006) (citing State v. Godsey, 60 S.W.3d 759, 783 (Tenn. 2001); Bland, 958 S.W.2d at 666).

While no crimes or defendants are identical, a death sentence is disproportionate if the case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Bland, 958 S.W.2d at 668. Thus, in our proportionality review, we examine "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved." State v. Stevens, 78 S.W.3d 817, 842 (Tenn. 2002). More specifically, we consider:

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

Reid, 164 S.W.3d at 316 (citing Bland, 958 S.W.2d at 667). We also consider several factors about the defendant, including his (1) record of prior criminal activity; (2) age, race, and gender; (3) mental, emotional, and physical conditions; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Id. at 316–17.

In this case, the unemployed, then-forty-year-old male African-American Defendant, who had a history of violent offenses, targeted an elderly African-American couple for pecuniary gain. It can be inferred that, having previously lived in close proximity to the elderly victims, the Defendant was familiar with Clarence James' habit of sitting in front of his garage and greeting passers-by. The proof established that on August 22, 2003, he and Mr. Young approached Mr. James and engaged him in conversation. Although the proof was not clear how the Defendant gained entrance to the house, the proof is clear that once inside, he restrained the physically frail eighty-two-year-old Mr. James by the use of some type of binding around his wrists and ankles, then stomped and strangled Mr. James, causing massive internal injuries, and eventually ended the skirmish by slitting Mr. James' throat. He took Mr. James' wallets from him and emptied the wallets of their contents. The Defendant then confronted Lillian James,

42

similarly binding her wrists and ankles, and also beat and strangled her, ending with cutting her throat to the point of nearly severing her head.  He took the rings that Mrs. James was wearing from her body and then went through the contents of her purse, taking at least one credit card.  The Defendant used the proceeds of his crimes to buy personal items for himself and Mr. Young, including a car, and then fled to Florida.  After his arrival in Florida, the Defendant killed another person using similar techniques.

Based on our thorough review of the record and Supreme Court Rule 12 reports,[13] we conclude that the death sentences imposed in this case are not excessive or disproportionate when compared to the penalty imposed in similar cases.  We have upheld the death sentences in numerous other cases where the defendants stabbed, beat and/or strangled the victims to death.  See, e.g., State v. Rollins, 188 S.W.3d 553 (Tenn. 2006) (defendant stabbed eighty-one-year-old victim during a robbery; aggravating circumstances (i)(5), (i)(6), (i)(7), and (i)(14)); State v. Leach, 148 S.W.3d 42 (Tenn. 2004) (defendant beat, stabbed, and strangled two elderly women during a robbery; aggravating circumstances (i)(2), (i)(5), (i)(7), and (i)(14)); Bane, 57 S.W.3d 411 (Tenn. 2001) (defendant and companions robbed and murdered elderly man during robbery by strangling and asphyxiating him; aggravating circumstances (i)(5) and (i)(6)); State v. Bush, 942 S.W.2d 489 (Tenn. 1997) (defendant repeatedly stabbed seventy-nine-year-old woman to death during a burglary; aggravating circumstances (i)(5) and (i)(6)); State v. Barber, 753 S.W.2d 659 (Tenn. 1988) (defendant beat elderly woman to death during burglary; aggravating circumstances (i)(5) and (i)(7)); State v. McNish, 727 S.W.2d 490 (Tenn. 1987) (defendant bludgeoned seventy-year-old victim to death during a robbery; aggravating circumstance (i)(5)); State v. Campbell, 664 S.W.2d 281 (Tenn. 1984) (defendant beat seventy-two-year-old victim to death during robbery; aggravating circumstances (i)(2), (i)(5), and (i)(7)); State v. Barnes, 703 S.W.2d 611 (Tenn. 1985) (defendant and companion beat elderly woman during burglary of her home and victim died of pneumonia resulting from beating; aggravating circumstances (i)(2), (i)(5), and (i)(7)); State v. Strouth, 620 S.W.2d 467 (Tenn. 1981), and State v. Dicks, 615 S.W.2d 126 (Tenn. 1981) (companion cases in which defendants received death penalty when elderly store owner's throat was cut during robbery; aggravating circumstances for both were (i)(5) and (i)(7)); see also Reid, 164 S.W.3d at 315–16 (defendant robbed a Baskin-Robbins store, abducted two employees, transported them to a local park, and cut their throats with a knife; aggravating circumstances (i)(2), (i)(5) and (i)(6)).

Based upon our close review of the entire record in this case, combined with our review of these and other cases in which the death penalty was imposed and upheld, we hold that the sentences of death imposed in this case are not disproportionate to the

---

[13] Tennessee Supreme Court Rule 12 requires trial courts to file extensive reports in all cases in which the defendant is convicted of first degree murder.  These reports include data about the crime, the defendant, and the punishment imposed.  See Tenn. Sup. Ct. R. 12(1) and the appendix thereto.

penalty imposed for similar crimes under similar circumstances. The Defendant is not entitled to relief on this basis.

## Conclusion

For the reasons set forth above, we affirm the Defendant's convictions and sentence of death.

The sentence of death shall be carried out as provided on the 8th day of April, 2020, unless otherwise ordered by this Court or other proper authority. It appearing that the Defendant Henry Lee Jones is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE

APPENDIX
(EXCERPTS FROM THE DECISION OF
THE COURT OF CRIMINAL APPEALS)

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 2, 2017 Session

**STATE OF TENNESSEE v. HENRY LEE JONES**

**Appeal from the Criminal Court for Shelby County**
**No. 03-06997          W. Mark Ward, Judge**
**No. W2015-02210-CCA-R3-DD**

[Introduction]

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

James E. Thomas (on appeal) and James M. Gulley (elbow counsel at trial), Memphis, Tennessee, for the appellant, Henry Lee Jones.

Herbert H. Slatery III, Attorney General and Reporter; Leslie R. Price, Assistant Attorney General; Amy Weirich, District Attorney General; Tom Henderson and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

[PRE-TRIAL PROCEEDINGS]

[GUILT PHASE]

[PENALTY PHASE]

ANALYSIS

[I.  The Right to Counsel and the Right to Self-Representation]

[II.  Testimony of Mr. Young]

III.  Admission of Autopsy Photographs into Evidence

Defendant asserts the trial court erred in admitting autopsy photographs of Mr. and Mrs. James through the testimony of Dr. Chancellor. Specifically, Defendant refers to the

45

"horrific injuries" highlighted in the photographs that were merely introduced to inflame the jury. The State defers to the trial court's discretion on the matter.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. The trial court must determine the relevance of the visual evidence and weigh its probative value against any undue prejudice. *Carruthers*, 35 S.W.3d at 577. The term "undue prejudice" has been defined "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm. Notes). In *Banks*, our supreme court provided the trial courts with guidance for determining the admissibility of relevant photographic evidence. The trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Id.* at 951. The admissibility of relevant photographs of victims and the crime scene is within the sound discretion of the trial court, and the court's ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion. *Carruthers*, 35 S.W.3d at 576-77; *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *Banks*, 564 S.W.2d at 949. As our supreme court stated in *Carruthers*, the modern trend is to vest more discretion in the trial court's rulings on admissibility. *Carruthers*, 35 S.W.3d at 577 (citing *Banks*, 564 S.W.2d at 949).

Prior to Dr. Chancellor's testimony at trial, defense counsel objected to the autopsy photographs of the victims as inflammatory, overly prejudicial, and cumulative. During a bench conference, the State presented photographs of both Mr. and Mrs. James that they planned to introduce. The State sought to introduce photographs of lacerations on different areas of Mrs. James's neck, arm, and wrist, bruises on her arm, and pressure marks on her ring finger. Defense counsel did not object to the admission of the photographs of Mrs. James's finger. The prosecutors also presented photographs of cuts on Mr. James's neck and arm, a photograph of his eye, a photograph of bruising on his shoulder and wrist, and a photograph of his rib bones. The State maintained the photographs of the neck wounds were necessary to prove premeditation, establish that the same person killed each of the victims, and assist in the jury's understanding of the testimony of Dr. Chancellor. The trial court admitted the photographs, finding that Rule 403 is a "rule of inclusion." The court noted that many of the photographs were not "graphic" but admitted that the pictures depicting the wounds to the throats of the victims could be deemed inflammatory. However, the trial court determined that the probative

value of the photographs outweighed their prejudicial nature, the pictures illustrated the State's case, and the State has "a right to do that." The trial court found the photographs were admissible and relevant to the issues to be determined by the jury.

We have reviewed the photographs in question, and conclude they are not so sensational as to be out of the ordinary of what would be expected of autopsy photographs of a victim with knife wounds. Additionally, Dr. Chancellor testified as to the necessity of the photographs to allow her to explain to the jury the wounds suffered by the victims. We conclude that the probative value of the photographs outweighs their prejudicial effect and the trial court did not abuse its discretion in allowing their admission. Defendant is not entitled to relief on this issue.

### IV. Tone of the Prosecutor During Closing Arguments

Defendant argues that the trial court erred in overruling an objection to the "tone and volume" used by the State during closing argument. Specifically, Defendant contends that his right to due process was violated when counsel for the State was "standing three feet from him and pointing at him and yelling at him." Despite his objection at trial, Defendant fails to adequately explain on appeal a basis for the overturning of a conviction based upon a prosecutor's method of presenting a closing argument.

While the scope and depth of closing argument is generally a matter within the trial court's discretion, *Bigbee*, 885 S.W.2d at 809, the State is not free to do what they wish. Arguments are required to be "temperate, based upon the evidence at trial, relevant to the issues being tried, and not otherwise improper under the facts of the law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)). Although not exhaustive, this Court has recognized five general areas of potential prosecutorial misconduct during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *Goltz*, 111 S.W. 3d at 6. However, "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008). Instead, "an improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." *Id.* In other words, it will be reversible error if the improper comments of the prosecutor were so improper or the argument so inflammatory that it affected the verdict. *See State v.*

*Reid*, 164 S.W.3d 286, 344 (Tenn. 2005). We use the following factors when making this determination:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5-6. However, the analysis set out in *Judge* applied to an improper statement and made no mention of the volume or tone of an argument. *See Judge*, 539 S.W.2d at 344.

Trial counsel for Defendant failed to adequately preserve any proof of the actions of the prosecutor other than stating in the objection that the prosecutor was yelling. The trial court did not note the volume or tone, nor did the trial court ask counsel for the State to step away from Defendant. In Defendant's appellate brief, there is only one reference to the record in his argument on this issue and no mention of any authority that bears on the issue of the tone and volume of the prosecutor during closing argument. Defendant is required on appeal to make appropriate references to the record in the argument portion of his brief and to cite relevant authority. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Failure to do so will ordinarily constitute a waiver of the issue. *See State v. Hammons*, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987). Under these circumstances, it is not the obligation of an appellate court to review this issue as it is presented. *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997). There is not enough evidence before this Court to adequately review the allegations much less overturn a conviction. Defendant has waived this issue.

[V. Sufficiency of the Evidence]

[VI. Denial of a Mitigation Expert/Investigator]

[VII. Mandatory Review]

[CONCLUSION]

48