IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2024

**STATE OF TENNESSEE v. CEDRIC PRICE A/K/A CEDRIC HOPGOOD**

**Appeal from the Circuit Court for Madison County**
No. 20-700-B      Donald H. Allen, Judge

_____

**No. W2023-01214-CCA-R3-CD**
_____

The Defendant appeals as of right his jury conviction of reckless homicide for which he received a sentence of twelve years' incarceration. The sole issue presented for our review is whether the evidence was sufficient to support the conviction. Upon our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

J. Colin Morris, Jackson, Tennessee, for the appellant, Cedric Price.

Jonathan Skrmetti, Attorney General and Reporter; George Kirby May, Assistant Attorney General; Jody Pickens, District Attorney General; and Shaun Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In the late-night hours of May 7, 2017, the Defendant injected 19-year-old Ahniya Bryson, the victim, with a substance called "new China white," which was the name for heroin mixed with fentanyl. The victim's girlfriend, Whitney Sells, initially thought the victim was enjoying the "high," but she quickly realized that something was not right when the victim did not regain consciousness. Sells told the Defendant about the victim's condition, and he told her they needed to get the victim out of his house and refused to call an ambulance. The Defendant threatened to "f*** up" Sells if she did not help him. The Defendant and Sells then put the victim and her belongings in the Defendant's car, drove to a gravel road, and dumped the victim's body in a ditch. Based on this conduct, on

November 30, 2020, the Defendant, along with codefendant Donald Wayne Duckworth, was indicted by a Madison County grand jury with alternative counts of second-degree murder for distributing heroin (count one) heroin and fentanyl (count two), which caused the death of the victim. The Defendant was additionally charged with distributing cocaine, which caused the death of the victim (count three).

The following proof was adduced at the Defendant's joint trial with codefendant Duckworth on May 9 and 10, 2023. Whitney Sells, a drug user of seven or eight years, testified that at the time of trial, she had been clean for four and a half years and was currently on probation for a drug offense. In 2018, she was doing drugs, but since she was on probation, she had turned her life around. The weekend of May 6 through 7, 2017, she was in a dating relationship with the victim. Sells had known the Defendant and the codefendant for a year before the instant offense, and she identified them in court. At the time of the offense, she lived with the Defendant at 98 Everette Street and testified that the codefendant lived on Browns Church Road. On Saturday of that weekend, Sells met the victim at the barbershop owned by the codefendant, and it was daylight. The victim, Sells, and the codefendant left the barbershop and went to the codefendant's house to get drugs. Sells' drug of choice was heroin, and the victim's drugs of choice were heroin and Xanax. When they arrived at the codefendant's house, the codefendant gave them "a little bit of heroin." Sells and the victim snorted the heroin in the bathroom and "hung out" at the codefendant's house for a while.

Sells and the victim used heroin intravenously; however, they had other people inject them because they did not know how to inject themselves. After they snorted the heroin, Sells and the victim had sex with the codefendant as payment for the drugs. They "hung out" a while longer, smoked weed, and got high. They were at the codefendant's house for about two hours. The codefendant then drove them to the Defendant's house. The codefendant dropped them off at the corner of Holland and Everette. The codefendant did not provide them with any drugs other than heroin and marijuana. Before they left his house, the codefendant gave them two "buttons" of heroin to use at a later time.

When the codefendant dropped Sells and the victim off, they were "not really" high at that time. They walked to the Defendant's house, and once they arrived, they showed him the heroin they received from the codefendant and told the Defendant they wanted him to "do it intravenously because [they] didn't know how to." Sells explained that their typical method was to snort heroin; however, intravenous use was "stronger." The Defendant, the victim, Sells, and the Defendant's wife were at his house at the time. The Defendant made "three spoons with [the heroin from the codefendant] and cocaine, and [the Defendant] shot [them] up."

Sells observed the Defendant mix the heroin she received from the codefendant with the cocaine the Defendant had. This was in powder form, and he heated the powder in the spoon, which bonds the cocaine and heroin together and melts it to liquid form. From there, the Defendant added water, heated the spoon, put a piece of cotton in it, used an empty syringe, stuck it in a cotton tip, and pulled the liquid up. Sells said the Defendant shot himself up in his forearm, then Sells, and then the victim. The process took about twenty or thirty minutes, and the mixture had little effect on Sells. The Defendant then introduced them to "the new heroin that he got because he felt like [the first needle] wasn't enough." He followed the same process with the new heroin and cocaine as he did with the first three spoons. Sells explained that at that time, she had not used fentanyl and that it was a drug used to cut heroin. She said at that time, if fentanyl were in the mixture, she would not have known because you cannot see it. With the second injection, Sells felt "very high" and different than what she experienced with the first injection.

When the Defendant gave the victim the second injection, the victim "got out" which meant that her "eyes rolled to the back of [her] head. . . . She wasn't awake." Sells let her enjoy it because "when you're using heroin, that's what you aim for, to nod out and enjoy it." However, after twenty minutes, Sells realized "something wasn't right." This occurred in the living room at the Defendant's house, and Sells, the Defendant, and his wife were present. They attempted to wake the victim by putting ice under the victim's armpits, placing her in the bathtub and splashing water on her, and attempting CPR, but the victim did not wake up. Sells could hear the victim breathing and believed the victim was okay. She believed the victim was sleeping because she could hear the victim snoring. Sells put the victim on the couch, got her dressed, laid down beside her, and went to sleep. At some point, Sells woke up, and the victim had a shallow pulse. Sells woke the Defendant and told him they needed to call an ambulance. In response, the Defendant told Sells they "needed to get [the victim] out of [his] house." At that point, it was dark outside, Sells was afraid, and the Defendant put the victim in the back of his car. He told Sells that she "better come with him or he was going to f*** [her] up too."

Sells got into the Defendant's car and left his house with him. Although she could not remember the exact route, she recalled they drove toward Beech Bluff. At some point, the Defendant stopped on a gravel road, pulled the victim and her belongings from the backseat of his car, left the victim on the side of the road, and drove off. Sells was in the car's passenger seat and did nothing to stop the Defendant because "he wasn't having it." Sells believed the victim was still breathing when the Defendant left her on the side of the road. Although the victim was not conscious, Sells could see her chest going up and down and believed the victim was still alive. Sells and the Defendant returned to the Defendant's house and did not notify the police.

- 3 -

The next morning, a Sunday, the victim's mother came to the Defendant's house looking for the victim. Sells did not tell the victim's mother where they left the victim because Sells was afraid. Sells did not speak with the codefendant after he had dropped her off earlier the night before. Later that Sunday, law enforcement came to the Defendant's house and asked about the victim. Sells did not provide them with a truthful statement because she was afraid. The Defendant was also present when law enforcement came to his home, but he did not provide a truthful statement.

Almost two years later, law enforcement approached Sells again, and due to her sobriety, she told them the truth about what happened to the victim. Sells agreed that she introduced the victim to the Defendant and the codefendant. Sells said when she met the victim, she was using Xanax; however, their drug of choice was anything they could get their hands on, but mainly heroin. Sells agreed that when she and the victim left the barbershop, they went to the codefendant's house with the intent to obtain drugs in exchange for sex.

On cross-examination by codefendant's counsel, Sells agreed that she had done "a lot" of heroin between the victim's death and the time that she had given her statement to law enforcement. She agreed that she was not employed at the time of the victim's death, and that she sold heroin and fentanyl. She also agreed that she and the victim sold their bodies in exchange for money. She agreed that her initial statement to law enforcement was untruthful. She agreed that she contested her conviction of the sale of heroin and fentanyl, went to trial, and attempted to convince the jury that she was not a drug dealer. She did not remember what she told law enforcement in her first statement because she was under the influence of heroin and afraid. She agreed that she gave her second statement to law enforcement five months after she was arrested for her felony drug sale conviction.

Sells did not recall various statements from her second statement to law enforcement. She insisted that she and the victim were at the codefendant's house for about two hours, and when they left, the victim was not high. Sells agreed that she thought the victim's mother dropped her off at the codefendant's barbershop, and when the victim's mother asked Sells about the victim's whereabouts the next day, Sells told her the victim was with the codefendant. Sells insisted the relationship between the victim and the codefendant involved nothing more than drugs. Although she was not certain, Sells believed there was fentanyl in the drugs that were injected by the Defendant based on the strength of the high. Sells was unaware whether the victim had experienced fentanyl before the day of the offense. Sells vaguely recalled a Facebook post she made in memory of the victim and agreed it may have been an attempt to "disassociate herself from liability" in this case. She agreed that she contributed to "dumping" the victim's body on the side of the road because she was threatened and afraid.

- 4 -

Sells recalled that the Defendant had someone clean his car after they dumped the victim's body and before law enforcement came to the Defendant's house. Sells agreed that she did not know how to inject drugs at the time of the offense; however, over her seven years as a drug user, she eventually learned how to inject, and she also experienced drug overdoses. She agreed that a drug overdose did not necessarily mean death and that there were medical interventions, such as Narcan, that reverse the effects of the opioid narcotic. Based on her experience, Sells believed the victim could have been saved had the Defendant allowed her to call an ambulance. When she got away from the Defendant, she did not call law enforcement or tell them the truth because she feared the Defendant. Sells admitted that following the victim's death, Sells sold drugs for the Defendant.

On cross-examination by defense counsel, Sells agreed that she had been using marijuana since the age of thirteen and heroin since 2017. Sells met the victim in 2016 when the victim was nineteen and Sells was twenty-one. Before using heroin, Sells used pain pills such as oxycodone, hydrocodone, and Percocet. She agreed that her initial statement to law enforcement was not true; however, after her arrest for the sale of fentanyl and heroin, she provided law enforcement with a truthful statement. She denied receiving a deal in exchange for the second statement and not being charged in connection with the victim's death. She said the comment that she and the victim went to the codefendant's house with him, and the victim had sex with the codefendant in exchange for cocaine and crack, was not true. She said she was "making up a story" because she was living with the Defendant and was afraid of him. She did not recall how long she lived with the Defendant after the victim's death and said she was "in and out" because she was "a junkie."

She agreed that she performed oral sex on the codefendant in exchange for $30 worth of heroin, but she did not recall whether she received any cigarettes. Although her first statement provided that she and the victim did cocaine at the codefendant's house, Sells did not recall doing cocaine there. Sells also did not recall that her initial statement provided that the victim was having trouble walking back to the Defendant's house because of all the drugs she had taken at the codefendant's house. When confronted with her direct testimony that she and the victim were not "very high" when they left the codefendant's house, Sells insisted her direct testimony was the truth. Despite being at the codefendant's house for hours, Sells insisted they were not high when they left.

Sells agreed that she sat on the couch with the victim for hours, cleaning foam off her nose, keeping her breathing, and trying to resuscitate her. She agreed that the Defendant was in another room while she did so and did not interfere with her efforts to resuscitate the victim. She verified everything in her initial statement as true, except she could not recall the fact that they did cocaine at the codefendant's house before going to the Defendant's house. Regarding her second statement after her arrest for the sale of fentanyl and heroin, Sells agreed that it was written by law enforcement.

On redirect examination, Sells said law enforcement wrote down what she said in her second statement, which she reviewed and signed. She believed there was fentanyl in the drugs injected by the Defendant because the drugs made her feel differently, and the Defendant told her it was "new China white," which was the name for heroin with fentanyl. She was afraid of the Defendant because he was a "big-time dope dealer" who knew "a lot of people that would do whatever he needed them to do for drugs." On recross examination by defense counsel, Sells said that the Defendant had threatened her by saying he would "f*** [her] up if [she] did not go with him or if [she] said anything."

Don Warren testified that on Sunday, May 7, 2017, he brought his mother-in-law and sister-in-law to Madison County to attend church. After church was over, he observed the victim's body near the driveway at 87 McAbee Road in Beech Bluff. He immediately called 911, reported what he saw, and waited for law enforcement to arrive.

Deputy Terry Sumner of the Madison County Sheriff's Department testified that he had twenty-seven years of experience in law enforcement. He was the first deputy to respond to the 911 call at 87 McAbee Road, and upon his arrival, observed "a young lady laying beside the road like in a ditch . . . . Her shoes and some other belongings had been strewn close by." He could not find a pulse and observed that the victim's body was cold to the touch. He also stated there were other signs that the victim was "obviously" deceased. Although the nature of the 911 call had described the body as that of a child, he stated that the victim appeared to be a petite adult. He identified various photographs of the scene showing the condition of the victim and her location on a dirt gravel road, which were admitted as evidence. Deputy Sumner secured the crime scene for further investigation.

Molly Britt, a Madison County Medical Examiner's Office nurse, had been employed as a medical death investigator since 2012. In May 2017, she was an assistant medical examiner and responded to the scene at 87 McAbee Road. She observed the victim lying on her back and wearing clothes. Her purse was close to her, she was not breathing, and she was not alive. She was shown a photograph of the victim previously admitted into evidence and stated the victim had a "foam cone," which meant the victim had drugs in her system. She examined the victim and determined that she was deceased. The victim's body was then transported to the forensic center for a full autopsy.

At the time of the offense, Ryan Smith worked at the Madison County Sheriff's Department. He responded to the scene at 87 McAbee Road. He retrieved the rape kit collected from the autopsy of the victim and transported it from the medical examiner's office to the Tennessee Bureau of Investigation (TBI) crime lab. On cross-examination by

defense counsel, he agreed that the term "rape kit" did not mean that a rape occurred in this case and that the codefendant was not on trial for rape.

When lead investigator Mike Arnold of the Jackson Police Department inherited this investigation, it was deemed a cold case and had been closed out. He testified that he had taken a statement from Sells on February 5, 2019. After speaking with Sells, he obtained a search warrant to collect DNA from the codefendant. On April 12, 2019, he collected swabs from the codefendant, which were later transported to the TBI lab for examination on April 16, 2019. The codefendant initially agreed to talk with him, was Mirandized, and appeared receptive to discussing the case. Investigator Arnold took notes during their discussions and recalled that the codefendant admitted that Sells and the victim had come to his barbershop on the day of the offense. He took them to his house, and they had consensual sex. He said he smoked marijuana with Sells; however, he denied that the victim used any drugs that night. Later that evening, the codefendant took Sells and the victim back to town and dropped them off near East Chester. Investigator Arnold was familiar with the location based on the information provided by Sells, and he also knew it was near the Defendant's house. The codefendant agreed that he had sex with the victim that night. When Investigator Arnold asked the codefendant to sign the statement, the codefendant declined and requested a lawyer.

On cross-examination by codefendant counsel, Investigator Arnold agreed that his work was primarily in narcotics investigation and that he had previously assisted in the prosecution of Sells. He also agreed that he spearheaded the February 2019 interview with Sells. He agreed that was the only time he had spoken with Sells about this case and that, at that time, Sells was subject to several other separate drug charges. Sells did not appear to be under the influence at the time of the interview, and she was also in custody at that time. He agreed that he was "incentivized" by charging Sells while simultaneously reopening a cold case. He reiterated that Sells told him she was not truthful in her first statement and that she told the truth in her second statement. He agreed that information regarding Sells and the victim having sex in exchange for money was not included in his report. While it "did not come up" in the investigation, he was aware that Sells had previously worked as a prostitute. He agreed that the codefendant told him that he had sex with Sells and the victim. He agreed that the codefendant did not admit to having sex with the women in exchange for drugs and that the codefendant did not mention money. He said the codefendant told him he and the victim had been in a "dating" relationship for six or seven months. He said that a "button" was a term used in drug culture that meant a tenth of a gram of heroin or a single-use amount. He agreed there was medical intervention such as Narcan that could reverse a drug overdose; however, Narcan does not work on cocaine, only opioids.

On redirect examination, Investigator Arnold said he began investigating this case in late 2018. He reviewed Sells' first statement before taking her second statement. Rather than untruthful, he classified the first statement as "not full" because Sells included more information in the second statement. On recross examination by defense counsel, Investigator Arnold agreed that he took the second statement from Sells after she was arrested and indicted for the sale of fentanyl and heroin, for which Sells was ultimately convicted.

Dr. Miquel Laboy, an expert in forensic pathology and autopsies, testified that he performed the autopsy of the victim on May 8, 2017. His external examination of the victim's body revealed, among other things, a "frothy fluid" on her nose and mouth and ecchymosis or "needle sticks" in the front, mid-portion of her forearm. Based on laboratory reports evaluating the victim's blood, he determined the victim's cause of death "was combined toxicities, including cocaine, fentanyl, and heroin," and the manner of death was accidental. He explained that the manner of death in cases such as this is categorized as accidental for purposes of the death certificate and not criminal liability. His report documenting the victim's autopsy, including the toxicology report, was admitted into evidence. On cross-examination by codefendant counsel, he agreed that it was possible that the victim could have ingested a lethal amount of cocaine. He agreed that Narcan could be used to regain a person's pulse and that time was critical. On cross-examination by defense counsel, he read the summary section of his report and agreed that the victim's death was "an accidental overdose." On redirect examination, he reiterated that if an individual did not receive medical intervention within five minutes, they would suffer brain damage.

TBI Special Agent Donna Nelson testified as an expert in DNA analysis. She identified the sexual assault kit from the victim's autopsy that was received at the TBI laboratory on August 10, 2017, which was assigned to Whitney Bogus, who was no longer employed with the lab. Agent Nelson could testify to the test results because she was Bogus's supervisor. As relevant here, from the victim's blood standard, she obtained a complete DNA profile of the victim. From the vaginal swabs, she obtained a DNA profile of at least two individuals, including at least one male contributor, that was deemed inconclusive. The sexual assault kit and the report reflecting the examination and findings were admitted into evidence. Agent Nelson personally analyzed the buccal swabs taken from the codefendant and determined that the codefendant could not be excluded as the male contributor in the vaginal swabs taken from the victim. Her report and findings were admitted into evidence.

Based on the above evidence, the jury convicted the Defendant of the lesser included offense of reckless homicide in each count. On July 11, 2023, the trial court merged counts two and three into count one for a single conviction. The court imposed a concurrent term

of twelve years confinement, which was to be served consecutively to several unrelated state and federal convictions. The Defendant filed his motion for a new trial on July 20, 2023, which was denied on August 24, 2023. He filed a timely notice of appeal, and this case is now properly before this court for review.

## ANALYSIS

The sole issue presented for our review is whether the evidence is sufficient to support the Defendant's conviction of reckless homicide. While not entirely clear from his brief, the Defendant argues that Sells was an accomplice to the offense and that her testimony was not corroborated. He acknowledges that he did not raise this issue in his motion for a new trial and claims he is entitled to plain error relief. In response, the State contends, and we agree, that the evidence was sufficient to support the Defendant's conviction of reckless homicide.

**Law.** "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at

379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

To sustain a conviction for reckless homicide, the State was required to establish that the Defendant committed a reckless killing of another. Reckless homicide is a Class D felony. "Reckless" means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist, or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint. Tenn. Code Ann. §§ 39-11-106(34), -302(c).

At the time of the offense, it was well-established that "evidence is insufficient to sustain a conviction when the conviction is solely based upon the uncorroborated testimony of one or more accomplices." State v. Thomas, 687 S.W.3d 223, 239 (Tenn. Mar. 7, 2024) (citing State v. Collier, 411 S.W.3d 886, 894 (Tenn. 2013) (internal quotation marks omitted) (abolishing common law accomplice-corroboration rule on a prospective basis)). "An accomplice is one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of a crime." State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004). As our supreme court has recently described the accomplice-corroboration rule:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

State v. Thomas, 687 S.W.3d at 240 (quoting State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)). To qualify as an accomplice, it is not enough that a witness had guilty knowledge, was morally delinquent, or participated in a related but separate offense. State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). The test is whether the alleged accomplice could be indicted for the same offense with which the defendant is charged. State v. Jones, 568 S.W.3d 101, 133 (Tenn. 2019) (internal citations and quotations omitted).

As an initial matter, the Defendant did not assert that Sells was an accomplice at trial, nor did he request an accomplice testimony instruction from the trial court. Because he has waived this issue, the Defendant is not entitled to relief regarding the trial court's failure to give the accomplice testimony instruction unless he establishes plain error. The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotations marks and citations omitted). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

In our view, Sells could not have been indicted for second-degree murder; therefore, she was not an accomplice. Although Sells was present at the time the victim overdosed, Sells did not provide the victim with fentanyl, heroin, and cocaine. Sells also did not inject the victim with the lethal mixture of drugs. Accordingly, we conclude that Sells was not an accomplice, and her testimony did not require corroboration. The Defendant is not entitled to relief.

Viewed in the light most favorable to the State, the evidence showed that the Defendant injected the victim with an initial dose of heroin and cocaine. Because the first mixture had a slight effect on them, the Defendant then introduced the victim to a second mixture, which he called "the new heroin" because the Defendant felt like the first needle "wasn't enough." With the second injection, Sells felt "very high" and different than what she experienced with the first injection. However, when the Defendant gave the victim the second injection, the victim's "eyes rolled to the back of [her] head. . . . She wasn't awake." After twenty minutes, Sells knew "something wasn't right," attempted to resuscitate the victim, and ultimately told the Defendant to call an ambulance. In response, the Defendant refused and told Sells they "needed to get [the victim] out of [his] house," threatened Sells that she "better come with him or he was going to f*** [her] up too," and drove to a gravel road where he dumped the victim's body in a ditch. The autopsy of the victim revealed needle sticks on the victim's forearm, and her bloodwork contained a lethal mixture of fentanyl, heroin, and cocaine. Based on this proof, a reasonable jury could find the Defendant guilty of reckless homicide. The Defendant is not entitled to relief.

## CONCLUSION

We affirm the trial court's judgment based on the above authority and analysis.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE